UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
POLICE OFFICER DANA HARGE,

                           Plaintiff,

                                                    AMENDED COMPLAINT
         - against -                                1:16-CV-5160-ALC

THE CITY OF NEW YORK, INSPECTOR
SYLVESTER GE, CAPTAIN TIMOTHY
MORGAN, CAPTAIN JOHN SANFORD,
LIEUTENANT JONATHAN LIPKE,
LIEUTENANT MARK LEVINE and
SERGEANT ADRIAN SANTIAGO all
individually as well as in their official capacity as       **Jury Trial Demanded**
employees of the New York City Police
Department,

                           Defendants.

-------------------------------------------------------------x

          Police Officer Dana Harge, by his attorney, Fred Lichtmacher of the Law Office of Fred

Lichtmacher, PC alleges the following, upon information and belief, as and for his Complaint:

                              **Introduction**

          The plaintiff is a male African-American, highly accomplished member of Highway

Patrol; an elite unit within the New York City Police Department (hereinafter, NYPD).  While

Highway permits "token blacks" in its ranks, Highway regularly, through overtly discriminatory

practices, prevents minorities from becoming members of, or if admitted into Highway, from

rising to positions of importance in Highway.  This practice is perpetuated even when minority

officers demonstrate clearly exceptional policing skills, which is the case in the instant matter.

Supervisors at Highway, pursuant to policy, intentionally interfere with minority officers' ability

                                   -1-

to perform, to the detriment of the public, in order to eliminate minority officers from being present in Highway and/or from excelling and/or rising through the ranks in Highway.   In the matter before this Court, the terms and conditions of the plaintiff's employment were severely altered for the worse, premised solely on his race.  The few people of color within Highway, for the most part, are there as show pieces and/or to do the dirty work of implementing discriminatory practices, under the direction of bigoted supervisors.  People of color within Highway are intentionally precluded from being seen in the media, or in parades or presidentials as the face of Highway, in order to maintain its image as an elite white unit.

### Jurisdiction and Venue

1      Jurisdiction is founded upon the existence of a Federal Question pursuant to 28 U.S.C. § 1331.

2      This action arises under 42 U.S.C. §2000e-2(a), i.e., Title VII; the Equal Protection clause of the Fourteenth Amendment pursuant to 42 U.S.C.  § 1983; as well as under the Administrative Code of the City of New York, § 8-107 et seq.

3      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, §1343(3&4).

4      Plaintiff respectfully requests that this Court exercise pendent jurisdiction pursuant to 28 U.S.C. § 1367 over plaintiff's New York City Administrative Code claims which arise out of the same common nucleus of operative facts as do plaintiff's federal claims.

5      Venue is appropriate in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) (1) as the NYPD is located at 1 Police Plaza in New York County New York.

6      Plaintiff's Fourteenth Amendment constitutional claims are brought to redress the deprivation of federal rights by both the City of New York and the individual defendants who

acted as state actors under color of law.

7        This action arises from the ongoing practice of the NYPD to exclude, discriminate

against and discourage people of color from joining and staying in its elite units; in the instant

matter, the elite unit is Highway.

**<u>Parties</u>**

8        Dana Harge is a citizen of the United States of African descent.

9        At all times relevant, Dana Harge was an employee of the NYPD serving as a Police

Officer in Highway assigned to District 3.

10        Defendant, the City of New York, is a Municipal Corporation within New York State.

11        Pursuant to its Charter, the City of New York has established and maintains the NYPD as

a constituent department or agency.

12        At all times relevant, the City of New York employed the personnel involved in the

incidents giving rise to this lawsuit.

13        Defendant the City of New York, through the NYPD, employs more than five hundred

employees for each working day in each of twenty or more calendar weeks in the current,

preceding and in all relevant calendar years.

14        Defendant Inspector Ge was, at all times relevant, a duly appointed and acting Inspector

employed by the NYPD and assigned at all times relevant to the District Headquarters of

Highway in Queens New York.

15        At all times relevant, Defendant Ge was acting under color of law.

16        Defendant Inspector Sylvester Ge was, at all times relevant, an agent, servant and

employee acting within the scope of his employment by defendant City of New York and through

-3-

his authority as a supervisor, he was capable of and did in fact determine and enact policy for NYPD Highway and through his authority as a supervisor and as one of Harge's direct supervisors, he was capable of and did in fact adversely effect the terms and conditions of Harge's employment.

17    Defendant Captain Timothy Morgan was, at all times relevant, a duly appointed and acting Captain employed by the NYPD and assigned during portions of the complained about incidents to Highway 3, and at other times he was assigned to the District Headquarters of Highway in Queens New York.

18    Captain Morgan is a Caucasian male.

19    At all times relevant, Defendant Morgan was acting under color of law.

20    Defendant Captain Morgan was, at all times relevant, an agent, servant and employee acting within the scope of his employment by defendant City of New York and through his authority as a supervisor, he was capable of and did in fact determine and enact policy for NYPD Highway and through his authority as a supervisor and as one of Harge's direct supervisors, he was capable of and did in fact adversely effect the terms and conditions of Harge's employment.

21    Captain Sanford was, at all times relevant, a duly appointed and acting Captain employed by the NYPD and assigned to Highway 3 in Queens New York.

22    Captain Sanford is a Caucasian male

23    At all times relevant, defendant Sanford was acting under color of state law.

24    Defendant Sanford was, at all times relevant, an agent, servant and employee acting within the scope of his employment with defendant City of New York and through his authority as a supervisor, he was capable of and did in fact determine and enact policy for NYPD Highway

-4-

and through his authority as a supervisor and as one of Harge's direct supervisors, he was capable of and did in fact adversely effect the terms and conditions of Harge's employment.

25    Defendant Lieutenant Jonathan Lipke was, at all times relevant, a duly appointed and acting Lieutenant employed by the NYPD and assigned at all times relevant to Highway 3 in Queens New York.

26    At all times relevant, Lieutenant Jonathan Lipke was acting under color of law.

27    Defendant Lieutenant Jonathan Lipke was, at all times relevant, an agent, servant and employee acting within the scope of his employment by defendant City of New York and through his authority as a supervisor and as one of Harge's direct supervisors, he was capable of and did in fact adversely effect the terms and conditions of Harge's employment.

28    Defendant Lieutenant Mark Levine was, at all times relevant, a duly appointed and acting Sergeant employed by the NYPD and assigned at all times relevant to Highway 3,

29    At all times relevant, Defendant Lieutenant Mark Levine was acting under color of law.

30    Defendant Lieutenant Mark Levine  was, at all times relevant, an agent, servant and employee acting within the scope of his employment by defendant City of New York and through his authority as a supervisor and as one of Harge's direct supervisors, he was capable of and did in fact adversely effect the terms and conditions of Harge's employment.

31    Defendant Sergeant Adrian Santiago was, at all times relevant, a duly appointed and acting Sergeant employed by the NYPD and assigned at all times relevant to Highway 3,

32    At all times relevant, Defendant Sergeant Adrian Santiago was acting under color of law.

33    Defendant Sergeant Adrian Santiago was, at all times relevant, an agent, servant and employee acting within the scope of his employment by defendant City of New York and through

-5-

his authority as a supervisor and as one of Harge's direct supervisors, he was capable of and did in fact adversely effect the terms and conditions of Harge's employment.

34     Pursuant to the New York City Administrative Code §8-107 (13) the defendant City of New York is liable for the discriminatory conduct of the individual defendants who exercised managerial and  supervisory responsibility over the actors causing plaintiff's harms as well as because NYC knew of its employee's discriminatory conduct, and acquiesced in such conduct and/or failed to take immediate and appropriate corrective action and thereby caused plaintiff's harms.

## Condition Precedent to Suit

35     On or about August 26, 2015, and within one hundred and eighty days of the last act of the ongoing conduct complained of pursuant to Title VII of the Civil Rights Act of 1964, Dana Harge filed a complaint with the Equal Employment Opportunity Commission (EEOC Charge No.: 520-2015-03526) premised on his being discriminated against due to his race.

36     The E.E.O.C. assigned Charge Number 520201503526 to Dana Harge's claim.

37     On or about June 1, 2016 the United States Department of Justice, Civil Rights Division issued a right to sue letter to Dana Harge.

38     This action was commenced within ninety days after issuance of the right to sue letter.

## Facts Underlying Plaintiff's Claims for Relief

39     Police Officer Dana Harge was assigned to Highway Unit # 3 in January 2008 after he graduated first in his motorcycle class, and he remains working at the same command as of this writing.

40      For the entire time Police Officer Harge has been with Highway he has received almost no motorcade time in presidentials.

41      Motorcades in presidentials are prestigious assignments within Highway Patrol and they frequently lead to overtime.

42      White officers who are similarly situated to Harge regularly receive time in motorcades and presidentials.

43      Up until March 2014, his career as a police officer was going extremely well and his future with the NYPD looked promising.

44      During his time with Highway there have been extremely few African American officers assigned to Unit #3.

45      Up to the time his EEOC claim was filed, Dana Harge was the only black officer in his platoon and there were only 2 members of Unit #3 with the rank of police officer in total.

46      In 2015, Highway Patrol citywide was only about 4% black with those few black officers being viewed as tokens as Highway which is overwhelmingly male and white.

47      Overall in 2015 black police officers represented approximately 15% of the officers in the NYPD while the overall population of New York City was approximately 25% black.

48      Shortly after Harge filed his complaint with the EEOC, and appeared in a newspaper article in the New York Daily News regarding his allegation of racism in the NYPD, the NYPD began increasing the number of officers of color in Highway.

49      Racism is routine in Highway.

50      When one Manhattan Highway Unit became largely integrated, it was disbanded and shut down, which upon information and belief, was orchestrated by Defendant Captain Morgan.

51     Harge's troubles with Captain Morgan became readily apparent and more pronounced in 2014, after he received an award from Mothers Against Drunk Drivers (MADD).

52     Harge has currently made more than 300 DWI arrests and in 2013 he was credited with making the most DWI arrests of any officer in the NYPD.

53     Also in 2013 and 2014 Harge received certificates for perfect attendance without taking any sick days.

54     Dana Harge's problems at Highway started with the MADD award as he was looking like somewhat of a rising star in Highway, something which bothered Captain Morgan.

55     After the acclaim Harge received from the MADD award, he was recommended for a promotion to Detective Specialist by an Inspector in March of 2014.

56     Sergeant Sce was assigned to write up the request because the other supervisors knew that Captain Morgan would not put Harge in for a promotion because Harge is black.

57     When Captain Morgan found out that Harge was up for a promotion, he began taking action against him, making certain his future in Highway Patrol would be down hill from that point forward.

58     Morgan openly stated that he not only would make sure Harge would not get the Detective's Shield, but that he would get Harge completely out of Highway Patrol.

59     Harge's recommendation for Detective Specialist was placed in a folder, but then mysteriously disappeared, in violation of departmental procedure; and it never reached the Chief of Transportation who would have been responsible for acting on it.

60     The Highway District Log #14/206 is the number which the recommendation was assigned before it disappeared.

-8-

61     By the spring of 2014, Captain Morgan began instructing officers to target and discredit Harge with the intended purpose of either getting him fired or transferred out of Highway.

62     From January 2008 until April 2014 Dana Harge had been written up and put in the minor violation log only twice.

63     However, since he received the recognition from MADD, Harge was put in the minor violation log approximately 9 more times in the following 15 months, with virtually all of these violations being bogus.

64     Subsequent to filing his EEOC complaint, Harge now receives even more frequent command disciplines (CD's) of which most are completely bogus and some of which are for offenses for which no Caucasian officers receive CD's.

65     One recent example, out of many, is that Harge was written up for not putting over the radio a break; something the Caucasian officers are allowed to do routinely.

66     Defendant Inspector Ge, who is good friends with Defendant Lipke, has aggressively prosecuted Harge internally for this bogus rule violation.

67     Defendant Ge has become so personally involved in prosecuting Harge internally, that he has come to work on his off days, with his young son, and photographed Harge's car looking for evidence to hurt him with the NYPD.

68     Morgan overtly favors his friends, white officers who enjoy opportunities to receive advanced training and better positions in the unit than do the black officers.

69     One exception is Defendant Lieutenant Jonathan Lipke, a person of color who does Morgan's bidding in exchange for favorable treatment; and Lipke is ironically the Integrity Control Officer.

70      As a perk for doing Highway's dirty work, upon information and belief, Lipke is the highest overtime earner in Hwy #3 out of all the supervisors, although he may not actually be performing all the overtime he is credited with and paid to do.

71      Lieutenant Lipke, Lieutenant Levine and Sergeant Adrian Santiago do most of the dirty work for Captains Morgan, Sanford and Inspector Ge in perpetuating the hostility and abuse to which Harge is subjected.

72      Captain Sanford also maintains the standard Highway Unit # 3 position of discriminating against officers of color.

73      Under the direction of Captain Morgan, his subordinate officers are fabricating facts and twisting events to make Dana Harge appear incompetent, to destroy his professional image and to make other supervisors lose their faith and trust in him and in so doing they have created and maintained an overtly hostile work environment which actually manifested in extreme harms to Harge's health and which cost him a promotion.

74      Because Dana Harge has not been performing badly and there is no tangible evidence of him having done anything wrong, the defendants have been framing him frequently.

75      There are strictly enforced quotas at Highway and if an officer does not write his quota of summonses he runs into problems on the job.

76      An officer not making his quota can be given inconvenient tours of duty, a bad car to work with and even an involuntary transfer out of Highway, something which bodes badly for the officer's career, along with other punishments.

77      Dana Harge has regularly met his quota of seventy (70) summonses regularly in spite of the road blocks the defendants and their agents have thrown up against him and he has done so

by having to work harder than similarly situated Caucasian officers.

78      On June 30, 2014 Harge was assigned to criminal court.

79      After leaving court and arriving at the parking lot at Highway 3, Harge's children's doctor called and he took the call while Lipke was trying to raise him on the radio.

80      His supervisors wrote him up for being off of his post, even though some of them saw him exactly where he was supposed to be, at Highway 3.

81      This is extremely unusual, because when officers are assigned to criminal court it is not the practice to raise officers on the radio and it is even more unusual for them to be given a CD for not monitoring the radio at such a time.

82      Afterwards, Captain Morgan was informed by Lieutenant Lipke about Harge getting a CD and Captain Morgan, even after he heard from a supervisor that Harge had not committed the violation, still punished Harge by removing him from  his DWI conditions spots.

83      Harge had been in those spots for approximately 3 ½ years during which time he was extremely successful.

84      Nevertheless, Captain Morgan made Harge move.

85      Shortly thereafter, Captain Morgan removed Harge from that platoon and knowingly put him on one which would be a hardship due to his childcare situation.

86      Working a conditions post means an officer can focus on the condition he is assigned to and not necessarily take radio calls.

87      One example of a condition, is DWI's.

88      An officer assigned to conditions focusing on DWI's is in a better position to make DWI stops and arrests than an officer who has to respond to jobs that are put over the radio.

-11-

89      Working a conditions assignment is particularly important to an officer who needs to meet a quota.

90      In August of 2014 a routine minor complaint against Harge, which should have been treated as extremely minor and resolved quickly in house at the officer's command, was stretched out until July of the next year and sent to IAB.

91      The first time Harge was called in for an interview regarding the August 2014 allegation, a sergeant and a lieutenant from group 27 handled the questioning and at the interview's conclusion Harge was told he had nothing to worry about and the case was going to be closed.

92      However, about one week later, on July 9, 2015-a second hearing was held for the same matter which at that time was conducted by Defendant Inspector Ge.

93      At that time, the minor incident was nearly a year old, an extremely odd procedure for a minor allegation.

94      Harge's delegate informed him that Inspector Ge had told him that he was ordered to "Zing" Harge.

95      On Nov 17, 2014 Harge was injured during an altercation with a combative motorist he was placing under arrest.

96      During this altercation, Harge called for backup and for the Platoon commander, Defendant Lieutenant Levine, to respond to his location.

97      It is customary for officers upon hearing a 10-13; (i.e., an officer needs assistance) to respond to help the officer in need, quickly.

98      Several Highway 3 officers came to Harge's aid and even a Highway officer from another borough responded to help subdue the aggressive perp.

-12-

99      While Harge was left waiting in the pouring rain on a cold afternoon, Lieutenant Levine and Lieutenant Lipke arrived in separate RMP's at the scene approximately 45 minutes after the 10:13 went over the radio, and they did not even get out of their vehicles.

100      Harge informed the late arriving supervisors that he had been injured, but in spite of his injury, Harge was still made to drive the perp to the 107pct, by himself, and subsequently from the 107pct back to Highway 3 before he was finally allowed to go to the hospital; approximately 2 ½ hours after the incident occurred in which Harge was injured occurred; this is not the way similarly situated Caucasian officers are treated at Highway.

101      While in the emergency room a supervisor showed up and said he was sent by Lieutenant Levine to check if Harge was "milking it."

102      His supervisors, Captain Morgan, Lieutenant Levine and Lieutenant Lipke never showed up at the hospital; something which is routinely done when a Caucasian officer is injured on the job.

103      It is not NYPD policy to have injured officers drive a perp to the station house after they are injured and need medical attention while other officers capable of driving are present.

104      Shortly thereafter, Harge's supervisors needlessly ordered him to be assessed by the Early Intervention Unit which  assesses officers' mental stability, often to relieve them of their firearms.

105      After speaking with a Sgt. from that unit she confirmed Harge was mentally stable and did not change his duty status.

106      Clearly Harge's supervisors sought to have him found mentally unstable which would have resulted in his guns being removed and him being put on modified duty; something which is

-13-

particularly dangerous for an active officer such as Harge, who has made numerous arrests and who could easily encounter vengeful criminals he had locked up without his gun to protect him.

107     Additionally, it is detrimental to an officer's career if he/she were to be modified, as it hinders the officer's ability to do his job well, to get overtime opportunities and to be promoted.

108     From November 17, 2014 until early March 2015 Harge was on limited duty due to the injury he received on November 17, 2014 and he was on the Telephone Switchboard (TS) for that entire period.

109     While working the TS post and on limited duty Harge was falsely accused by Captain Sanford of milking his injury and malingering and Sanford threatened to transfer Harge to the 46 pct, which is a high crime area, and a long ride from Harge's home with a toll involved.

110     Throughout his time on the TS post Harge was subjected to frequent comments about alleged malingering.

111     Harge did not return to patrol until March of 2015, and when he did return, he still needed to receive physical therapy 3 times a week.

112     In December of 2014 Capt Morgan, ordered Harge's evaluating supervisor, to lower his evaluation which would have been 4.5; an exceptionally high evaluation and in the range of Harge's prior evaluations.

113     The Sergeant unwillingly was pressured to and did change Harge's evaluation to a 3.5.

114     Captain Morgan was transferred to the Highway District in January of 2015 where he still had authority over Highway 3 personnel.

115     At that time Captain Sanford was made the CO of Highway 3.

116      On March 4, 2015 when Harge's family had a minor emergency, Captain Morgan

-14-

ordered his subordinate officers to deny Harge the day off and to add "no excusals" for Harge in particular on the change sheet eliminating the chance of anybody else giving him the day off.

117     This is something that was done purposely and for no legitimate purpose other than to injure Harge and which is not done to similarly situated Caucasian officers.

118     As of April 3, 2015, when Harge took an Emergency day he was told by Captain Sanford that he is a scammer and he is no longer allowed to drive Detective Steven McDonald.

119     McDonald is regarded to be a hero officer who was shot and paralyzed several years ago. It is a high honor in the NYPD to have the privilege of driving Detective Steven McDonald and Harge had regularly driven him around for years and developed a close relationship with the Detective and with his family.

120     This honor was denied to Harge, in spite of the effect it may have on Detective McDonald and his family, and it was taken away from Harge without a legitimate explanation merely to further harass him, punish him and to diminish the respect he receives in Highway.

121     As of April 3, 2015 Harge was singled out when a note was put on the Highway 3 desk stating that Harge should not be granted any lost time or Emergency days without direct authorization from Lieutenant Lipke or Captain Sanford.

122     This effectively prevents Harge from taking emergency days when he needs them.

123     On April 25 2015, while on patrol, a motorist failed to stop and recklessly crashed into three separate vehicles injuring multiple occupants.

124     The motorist abandoned his car and fled on foot as Harge gave chase for several blocks.

125     After the motorist was apprehended due to the arrest processing Harge did not go end of tour until 11:30pm later that night, which was substantially after his tour was scheduled to end.

126    As Harge ended his tour of duty late, he forgot to "turn in" four summonses he had issued the previous day, which is a common occurrence for people in Harge's situation forced to work late.

127    The next morning Defendant Lieutenant Lipke went to where Harge was conducting a motorcycle stop and went through Harge's personal bag and took out summonses Harge issued that day as well as the day before.

128    Defendant Lieutenant Lipke then had Harge show him video from approximately 7 car stops costing Harge valuable time away from patrol and costing the public the benefit of his police work.

129    After he was done Defendant Lieutenant Lipke purposely hid Harge's memo book under the shot gun rack in the rear of his RMP.

130    Defendant Lieutenant Lipke then wrote up Harge in the minor violations log because he failed to turn in the 4 summonses from the previous day, something which is common practice in Highway 3 for officers in similar scenarios, none of whom upon information and belief have been punished for so doing.

131    Shortly thereafter, Harge approached Lieutenant Levine about what took place and specifically informed him that Lieutenant Lipke was abusing his authority and creating a hostile working environment by deliberately harassing him, however upon information and belief, no action was taken regarding his complaint.

132    In May of 2015 Harge gave out 82 summonses, which is well over the quota of 70 per month demanded by Highway.

133    After that, Harge was not allowed to use an unmarked RMP.

-16-

134    Unmarked RMP's are the preferred vehicles for members of highway to drive while seeking to write summonses undetected by speeding motorists.

135    This was done solely to interfere with Harge's success and to get him transferred out of highway.

136    The last day Harge was in an unmarked car, he wrote 15 summonses in 7 hours.

137    However, without an unmarked car, it is significantly more difficult to catch suspects and write summonses.

138    Additionally, at that time, Harge was still going for physical therapy three times a week for his Nov 17, 2014 injury making it even more difficult for him to make his quota.

139    On Friday May 8, 2015 Harge spoke with Captain Sanford in regard to the harassment he was being subjected to by Lieutenant Lipke but nothing was done about his complaint.

140    Shortly thereafter, on Sunday May 17, 2015 the PBA delegate, PO Russo, informed Harge that Lieutenant Lipke wanted his memo book and was giving him a Command Discipline for yelling at him; something he had not done.

141    Lieutenant Lipke then did not return Harge's memo book until 15:30, even though his end of tour was 14:35 and Lieutenant Lipke had signed the memo book at 14:40 deliberately making Harge miss overtime and also causing him to be late picking up his children.

142    For a lengthy period of time Harge was assigned to Post # S304 which covers the southern end of Queens.

143    Despite being extremely productive working on Post # S304 on May 18, 2015 Harge was told that he could no longer work that post and he was assigned to Post # S301 the closest post to the Highway 3 base while being told that he was given this new post because he needed to be

monitored and closely supervised.

144     However, Defendant Captain Sanford, told Harge that he was transferred off of his post

because his "Gumba" live down there-referring to the predominantly black population he had

been patrolling.

145     On May 27, 2015 Harge wrote an internal EEO complaint regarding the racism he was

experiencing on the job.

146     In May of 2015 Defendant Lieutenant Lipke went to the Queens District Attorneys'

intake office and told the supervisor that Harge is a problem and he personally wants to be

notified and updated whenever Harge makes a new arrest.

147     On May 29 2015  Harge made an arrest and Lipke was notified.

148     When Lieutenant Lipke received the requested call from the ADA he then told Harge's

supervisors that the phone call from the ADA's office was to complain about improper arrest

paperwork when in fact it was merely a response to his request to be notified of Dana Harge's

arrests.

149     After the May 29, 2015 arrest and the call from the DA Lieutenant Lipke changed the

arrest processing procedure for everyone, so as not to be caught singling Harge out, and Harge's

fellow officers, now refer to this as "Officer Harge's Special Rules."

150     On June 8, 2015 Harge called in asking for the day off and informed the supervisor that

he was not feeling well, something Harge had not done in several years.

151     There were several officers working that day and it would not have been a problem for

anyone else to have been given the day off.

152     However, Lieutenant Levine denied Harge's request and told him to "tough it out."

153     After he got to work Harge had to be removed to the hospital by EMS with his blood pressure registering in the range of 180/100.

154     When he was released from the hospital and as soon he returned to the base Lieutenant Lipke and Captain Sanford "lectured him" with complete disregard for his condition and wrote him up for being off post during his time in the hospital.

155     On June 16 2015, Harge was assigned a conditions post in a marked RMP but a few hours later, Captain Morgan caused him to be taken off of that post and had him returned to Highway 3, where he was switched to a patrol post.

156     From that day forward, until an article about Harge's complaint was published in the NY Daily News late in September of 2015, Harge had not been allowed to work conditions at all.

157     Lieutenant Levine stated " If he can't get his summonses on post without conditions too bad for him maybe he can go work some place else."

158     Afterwards, Morgan erected more obstacles to make it as difficult as possible for Harge to reach his required quota.

159     After June 16 virtually all the other officers at Highway had turns at conditions except for Harge, who was the only black officer on patrol in the Highway 3 day tour platoon.

160     Coincidentally, for an extended period, Harge was the only cop not allowed to be assigned to conditions, and the only officer not allowed to use an unmarked vehicle, making it extremely difficult for him to reach his quota.

161     On the morning of June 22, 2015 while assigned Post # S301 Harge was doing traffic enforcement at the LIE and BQE when an accident came over the radio on his post.

162     When he encountered Defendant Lieutenant Levine there, Levine checked Harge's

summons book and found eight summonses.

163     Harge was then written up in the minor violations log for writing tickets off his post; something all the other similarly situated Caucasian Highway officers are allowed to do without being written up.

164     On July 10, 2015 Harge's squad supervisor chose him to be her driver for the US Women's Soccer Team ticker tape parade down Broadway.

165     Part of Harge's assignment that day was to be escorting the team bus, which is a great honor.

166     Upon his arrival at the location, as Captain Morgan observed Harge driving lead car with his Sergeant., Morgan immediately confronted the Sergeant and asked her how dare she bring Harge to the detail.

167     Morgan said that Harge is a "cancer" and a "boob" and Capt. Morgan then replaced both of them with a white Sergeant from Highway 1 who had been scheduled to cover the FDR drive.

168     Upon information and belief there were no black officers from Highway on the parade that day, despite there being approximately 15-20 highway officers, from different districts, working the parade.

**POST EEOC FILING RETALIATION AND STEPPED UP DISCRIMINATION**

169     On May 27, 2015 Harge complained internally to the NYPD EEO reporting he was being discriminated against due to the color of his skin.

170     On August 26, 2015, Harge filed a claim with the federal EEOC alleging racial discrimination at work.

171     On September 14, 2015, the New York Daily News ran a story related to Harge's

complaints of racial discrimination with a followup story printed on September 21, 2015.

172     Subsequent to the EEO and EEOC complaints and the Daily News articles, Highway 3 brought in a few token African American officers, to raise the percentage of African Americans in that command and to create a false appearance of equality in the way African Americans are treated at Highway.

173     Subsequent to the EEO, EEOC complaint and the Daily News article being published, acts of hostility against Harge have increased exponentially.

174     Defendant Lieutenant Lipke began dedicating a large portion of his time to monitoring, harassing and writing up Harge for acts he either did not commit or which similarly situated Caucasian officers routinely do without negative consequences.

175     After the EEOC Complaint and Daily News Article, Harge's supervisors began telling other Sergeants and other superior officers to, in sum and substance, make Harge's life even more miserable and they began spreading the word that Harge was a disciplinary problem.

176     The Sergeants and other superior officers were told explicitly to not allow Harge lost time, which is the ability all officers have to either come in late or leave early when necessary.

177     Sergeants and other superior officers were explicitly informed by defendant Levine that Harge was not to receive time off without the express permission of Lieutenant Lipke and one other supervisor, something all other officers are granted when warranted.

178     Harge is now receiving constant false complaints in the form of CD's and minor violation log entries.

179     On December 6, 2015 Harge, reported he was ill to Defendant Santiago.

180     Santiago pressured Harge not to go out sick.

181     Once again an ambulance had to be summoned for Harge who again was suffering with

dangerously high blood pressure and he had to be taken by ambulance to the hospital.

182     Defendant Santiago threatened Harge not to report sick and not to be taken by ambulance

to the hospital, which he did in spite of Santiago's threats.

183     Harge went to the hospital and was put through testing for HTN and various related

problems, after which, due to medical necessity Harge was out sick until February 2016, when he

came back on limited duty, operating the telephone switchboard (TS) position.

184     Upon information and belief, Harge's HTN is a direct result of the harassment and

disparate and worse treatment to which Harge is regularly subjected.

185     When Harge returned to work, Santiago created new punitive rules only for Harge at the

TS post.

186     For a time, only Harge was not allowed to eat at the TS post.

187     Only Harge is not given time to "pull his cases" to prepare for court appearances on the

summonses he had written.

188     In his recent evaluation, written by Defendants Levine and Santiago, instead of the

woman who was actually supervising Harge during the relevant time period, not surprisingly his

score was approximately 33% lower than his usual evaluations and undeservedly so.

189     On June 16, 2016 Defendants Levine and Santiago, did not allow Harge to take lost time

to see his daughter graduate, despite the fact that there were extra officers available and two other

officers were given lost time merely to go home.

190     Other similarly situated Caucasian officers are routinely granted the request that Harge

was denied.

191     Lieutenant Levine has recently written a CD to Harge for several false charges including

being off post, excessive time to make a report and stealing time for which the NYPD is looking

to take vacation time away from Harge.

192     On June 20, 2016 when Harge appeared on one of the bogus CD's he was informed of a

new CD and pressured, to in sum and substance, admit to the false allegations and to accept the

penalty of 10 days lost vacation time which he refused to do.

193     At this time, generally, his supervisors harass Harge every day.

194     He is singled out for supervisors to show up and sign his memo book when he appears in

criminal court, something that is not regularly done to similarly situated Caucasian officers.

195     Harge has been regularly visited while on patrol by supervisors only to interfere with his

ability to do his work while supervisors allegedly review his memo book and videotapes,

reducing his ability to do his job effectively while simultaneously denying the public the

protection of his services.

196     As a pretext for much of the discriminatory treatment Harge has been receiving his racist

supervisors have dishonestly accused him of chasing women while he is on the job which is

false, of malingering which is false and of being off his post which is false.

197     Harge is incessantly demeaned and humiliated in front of his fellow officers by the

Defendants.

198     While Caucasian officers caught actually visiting his girlfriend while on duty receive no

serious punishment defendants have alleged and attempted to punish Harge for the same act

which he actually did not commit.

199     Supervisors are pressured by the defendants to take action against Harge and those who

refuse are retaliated against, in some cases by being threatened with involuntary transfers, in some cases with actual transfers out of Highway and when the involuntary transfers occur, calls are made to the new command informing that the transferred person is problematic.

200    Harge is precluded from motorcades and presidentials, his promotion was shelved and he is constantly subjected to a hostile work environment due to his race, despite his outstanding record, something Highway does not want an African-American to have.

201    On February 4, 2016, two years after the aforementioned minor complaint in August of 2014, Plaintiff was given a command discipline for a charge loosely related to the initial bogus complaint.

202    At one point in the investigation of the aforementioned minor incident, Defendant Ge bought the complainant a cell phone and had her wear a wire and flirt with the Plaintiff in an unsuccessful effort to lead Plaintiff into misbehaving.

203    After the filing of his federal complaint on June 30, 2016, retaliation against Harge increased.

204    On August 8, 2016 Plaintiff was given an additional four charges and specifications related to an alleged domestic incident.

205    On November 1, 2016 Plaintiff was given four charges and specifications on various alleged actions from May and July of 2015.

206    On April 18, 2017 Plaintiff was given an additional false charge for "interfering in the investigation" of the alleged domestic incident.

207    On April 18, 2017 Plaintiff was also given an additional charge with the miscellaneous four, from an incident in June 2016.

-24-

208    Harge has been modified, is denied overtime, is working in VIPER, an ill regarded

command and he has continued to be harassed and retaliated against at the time this complaint

was amended.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF PLAINTIFF'S**
**RIGHTS UNDER TITLE VII, 42 U.S.C. §2000e-2(a) (1 & 2)**
<u>**AGAINST THE CITY OF NEW YORK**</u>

209    Plaintiff repeats the previous allegations as though fully stated herein.

210    By the actions described, Dana Harge was deprived of his rights secured by Title VII,

i.e.,42 U.S.C. §2000e-2(a) (1 & 2) premised on his right to be free from discrimination based on

race.

211    NYC violated Title VII 42 U.S.C. §2000e-2(a) (1) in that it discriminated against Dana

Harge in the terms, conditions and privileges of his employment, because of his race and color.

212    NYC violated Title VII 42 U.S.C. §2000e-2(a) (2) in that it discriminate against Dana

Harge by depriving him of employment opportunities, including but not limited to promotions

and overtime and otherwise adversely affected his status as an employee, because of his  race and

color.

213    NYC violated Title VII 42 U.S.C. §2000e-2(a) (1) (2) in that its hiring and promotion

practices disqualifies substantially disproportionate numbers of blacks from being hired, and for

those who are hired, they encounter disparate treatment when seeking promotions and preferred

assignments within the NYPD's elite Highway units.

214    Plaintiff was subjected to racial discrimination that created an intimidating, hostile and

offensive working environment.

-25-

215    The harassment plaintiff was and still is subjected to is severe and pervasive.

216    Plaintiff's supervisors were in a position to and did adversely affect the terms and

conditions of plaintiff's employment.

217    Defendant City of New York knew of and disregarded the disparate and worse treatment

to which the plaintiff was subjected.

218    As a direct consequence thereof, Dana Harge has been damaged; he is emotionally

harmed, his career has suffered, he has been illegally denied a promotion, he has been denied

overtime, he has had his employment record and career path damaged, he has been denied

prestigious assignments, he is harassed and written up constantly, he has been and continues to

be pecuniarily harmed, he has been defamed in his profession, there have been physical

repercussions to defendants' treatment of Dana Harge directly resulting in physical problems

including but not limited to HTN and hospitalizations and he has been treated differently and

worse than similarly situated Caucasian employees in numerous regards.

219    The plaintiff is entitled to compensatory damages in an amount to be determined by the

trier of fact and the plaintiff is entitled to an award of reasonable attorneys' fees and costs

pursuant to 42 U.S.C. 2005-e (5) (k).


**SECOND CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS FOR VIOLATING**
**PLAINTIFF'S RIGHTS UNDER THE ADMINISTRATIVE**
**CODE OF THE CITY OF NEW YORK§8-107(1)(a) et seq.**

220    Plaintiff repeats the previous allegations as though fully stated herein.

221    By the actions described, Dana Harge was deprived of his rights secured by New York

City Administrative Code§8-107 (1)(a) et seq. including, but not limited to his right to be free

from discrimination based on race.

222    As a direct consequence thereof, Dana Harge has been damaged; he is emotionally

harmed, his career has suffered, he has been illegally denied a promotion, he has been denied

overtime, he has had his employment record and career path damaged, he has been denied

prestigious assignments, he is harassed and written up constantly, he has been and continues to

be pecuniarily harmed, he has been defamed in his profession, there have been physical

repercussions to defendants' treatment of Dana Harge directly resulting in physical problems

including but not limited to HTN and hospitalizations and he has been treated differently and

worse than similarly situated Caucasian employees in numerous regards.

223    The plaintiff is entitled to compensatory and punitive damages in amounts to be

determined by the trier of fact and the plaintiff is entitled to an award of reasonable attorneys'

fees and costs pursuant to New York City Administrative Code §8-502(a & g).

### THIRD CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS FOR VIOLATING
### PLAINTIFF'S RIGHTS UNDER THE ADMINISTRATIVE
### CODE OF THE CITY OF NEW YORK §8-107 (6) et seq.

224    Plaintiff repeats the previous allegations as though fully stated herein.

225    By the actions described, Dana Harge was deprived of his rights secured by New York

City Administrative Code §8-107 (6).

226    Dana Harge was deprived of his right to be free from discrimination based on race in that

by the actions described, the defendants jointly and severally aided, abetted, incited, compelled

and coerced the performance and attempted performance of acts forbidden under the

Administrative Code § 8-107 (1)(a); resulting in plaintiff being subjected to disparate and worse

treatment premised on his being African American.

227    As a direct consequence thereof, Dana Harge has been damaged; he is emotionally

harmed, his career has suffered, he has been illegally denied a promotion, he has been denied

overtime, he has had his employment record and career path damaged, he has been denied

prestigious assignments, he is harassed and written up constantly, he has been and continues to

be pecuniarily harmed, he has been defamed in his profession, there have been physical

repercussions to defendants' treatment of Dana Harge directly resulting in physical problems

including but not limited to HTN and hospitalizations and he has been treated differently and

worse than similarly situated Caucasian employees in numerous regards.

228    The plaintiff is entitled to compensatory and punitive damages in amounts to be

determined by the trier of fact and that the Plaintiff is entitled to an award of reasonable

attorneys' fees and costs pursuant to New York City Administrative Code §8-502(a & g).

### FOURTH CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS FOR VIOLATING
### PLAINTIFF'S RIGHTS UNDER THE ADMINISTRATIVE
### CODE OF THE CITY OF NEW YORK§8-107 (7) (I)

229    Plaintiff repeats the previous allegations as though fully stated herein.

230    By the actions described, Dana Harge was deprived of his rights secured by the New York

City Administrative Code §8-107 (7) (i) in that he was retaliated against because he opposed and

complained about practices forbidden under §8-107(1)(a) & (6) as well as other illegal practices

of the Defendants as well as for filing this complaint in federal court.

231    As a direct consequence of his complaining to the EEO, EEOC, the Daily News and in

federal court, Dana Harge has been retaliated against and damaged; he is emotionally harmed, his

career has suffered, he has been illegally denied a promotion, he has been denied overtime, he has had his employment record and career path damaged, he has been denied prestigious assignments, he is harassed and written up constantly, he has been and continues to be pecuniarily harmed, he has been defamed in his profession, there have been physical repercussions to defendants' treatment of Dana Harge directly resulting in physical problems including but not limited to HTN and hospitalizations and he has been treated differently and worse than similarly situated Caucasian employees in numerous regards.

232     The plaintiff is entitled to compensatory and punitive damages in amounts to be determined by the trier of fact and that the Plaintiff is entitled to an award of reasonable attorneys' fees and costs pursuant to New York City Administrative Code §8-502(a & g).

**FIFTH CLAIM FOR RELIEF**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATING**
**PLAINTIFF'S RIGHTS PURSUANT TO THE EQUAL PROTECTION CLAUSE**
**OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. §1983**

233     Plaintiff repeats the previous allegations as though fully stated herein.

234     By the actions described, Dana Harge was deprived of his rights secured by the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. §1983.

235     Harge has been treated differently and substantially worse, by the individual defendants due to his color and race.

236     Similarly situated Caucasian officers were not subjected to the treatment Harge was.

237     As a direct consequence thereof, Dana Harge has been damaged; he is emotionally harmed, his career has suffered, he has been illegally denied a promotion, he has been denied overtime, he has had his employment record and career path damaged, he has been denied

prestigious assignments, he is harassed and written up constantly, he has been and continues to be pecuniarily harmed, he has been defamed in his profession, there have been physical repercussions to defendants' treatment of Dana Harge directly resulting in physical problems including but not limited to HTN and hospitalizations and he has been treated differently and worse than similarly situated Caucasian employees in numerous regards.

238    The plaintiff is entitled to compensatory and punitive damages in amounts to be determined by the trier of fact and the plaintiff is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988.

### SIXTH CLAIM FOR RELIEF
### AGAINST THE CITY OF NEW YORK PURSUANT TO MONELL
### VIOLATION OF PLAINTIFF'S RIGHTS
### PURSUANT TO THE EQUAL PROTECTION CLAUSE
### OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. §1983

239    Plaintiff repeats the previous allegations as though fully stated herein.

240    By the actions described, Dana Harge was deprived of his rights secured by the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. §1983.

241    Defendant NYC has a *de facto* policy of discriminating against people of color becoming members of its elite Highway units and when a small number of black officers is admitted to Highway, they are treated differently and worse than similarly situated Caucasian officers.

242    Plaintiff was discriminated against premised on an official policy and/or custom that caused the plaintiff to be subjected to a denial of his constitutional right, as protected by the Equal Protection clause of the Fourteenth Amendment.

243    As a direct consequence thereof, Dana Harge has been damaged; he is emotionally harmed, his career has suffered, he has been illegally denied a promotion, he has been denied

overtime, he has had his employment record and career path damaged, he has been denied

prestigious assignments, he is harassed and written up constantly, he has been and continues to

be pecuniarily harmed, he has been defamed in his profession, there have been physical

repercussions to defendants' treatment of Dana Harge directly resulting in physical problems

including but not limited to HTN and hospitalizations and he has been treated differently and

worse than similarly situated Caucasian employees in numerous regards.

244     The plaintiff is entitled to compensatory and punitive damages in amounts to be

determined by the trier of fact and the plaintiff is entitled to an award of reasonable attorneys'

fees and costs pursuant to 42 U.S.C. §1988.

### SEVENTH CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS FOR VIOLATING
### PLAINTIFF'S RIGHTS PURSUANT TO THE EQUAL PROTECTION CLAUSE
### OF THE FOURTEENTH AMENDMENT
### PURSUANT TO 42 U.S.C. §1983 VIA RETALIATION

245     Plaintiff repeats the previous allegations as though fully stated herein.

246     By the actions described, Dana Harge was deprived of his rights secured by the Equal

Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. §1983 by acts of

retaliation.

247     As described supra, after the plaintiff complained about the discrimination he was being

subjected to, with the NYPD's internal EEO, the federal EEOC, in a newspaper article in the NY

Daily News, and in federal court after which, the treatment Harge was being subjected to became

even worse.

248     Harge was retaliated against and continues to be retaliated against for complaining about

the discrimination to which he was continually being subjected.

249     The defendants' retaliatory action in response to their employee's participation in discrimination investigations and proceedings constituted an impermissible reason to treat the plaintiff employee differently and worse than other similarly situated employees.

250     As a direct consequence thereof, Dana Harge has been damaged; he is emotionally harmed, his career has suffered, he has been illegally denied a promotion, he has been denied overtime, he has had his employment record and career path damaged, he has been denied prestigious assignments, he is harassed and written up constantly, he has been and continues to be pecuniarily harmed, he has been defamed in his profession, there have been physical repercussions to defendants' treatment of Dana Harge directly resulting in physical problems including but not limited to HTN and hospitalizations and he has been treated differently and worse than similarly situated Caucasian employees in numerous regards.

251     The plaintiff is entitled to compensatory and punitive damages in amounts to be determined by the trier of fact and that the Plaintiff is entitled to an award of reasonable attorneys' fees and costs pursuant to 42U.S.C. § 1988.

<u>Request for Relief</u>

WHEREFORE, Plaintiff respectfully requests that judgment be entered as follows:

(A)     Declaratory relief as follows:

1.      A declaration that Plaintiff's right under Title VII, i.e., , 42 U.S.C. §2000e-2(a) were violated;

2.      A declaration that Plaintiff's right under 42 U.S.C. § 1983, were violated;

3.      A declaration that Plaintiff's rights under New York City Administrative Code §8-502(a) and §8-107

were violated;

(B)    Compensatory damages in an amount to be fixed at trial;

(C)    By reason of the wanton, willful and malicious character of the conduct complained of herein, punitive damages from the individual defendants in an amount to be fixed at trial;

(D)    An award to plaintiff of the costs and disbursements herein;

(E)    An award of attorney's fees pursuant to the relevant statutes, including but not limited to 42 U.S.C. §2000e-5K; 42 U.S.C.§1988 and New York City Administrative Code §8-502(f); and

(F)    Such other and further relief as this Court may deem just and proper.

Dated: February 16, 2018
        New York, New York

_____/ s /_____
Fred Lichtmacher
The Law Office of Fred Lichtmacher, PC
  Attorney for Plaintiff
116 West 23rd Street Suite 500
New York, York 10011
(212) 922-9066

Danielle Marie Dandrige
The City of New York
100 Church Street
New York New York 10007

-33-