UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  08/26/2021
```

-----------------------------------------------------------------------X
                            :

DANA HARGE,                     :

                       :

          Plaintiff,     :

                       :        16-cv-5160 (LJL)

      -v-               :

                       :     OPINION AND ORDER

CITY OF NEW YORK, et al.,     :

                       :

         Defendants.   :

                       :

-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Dana Harge ("Plaintiff" or "Harge"), brings this action under Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.* ("Title VII"), and under the

Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.  Plaintiff

additionally brings state law claims under the New York City Human Rights Law, N.Y.C.

Admin Code § 8-107, *et seq.* (the "NYCHRL").[1]  Plaintiff alleges that his employers, the City of

New York, Inspector Sylvester Ge, Captain Timothy Morgan, Captain John Sanford, Lieutenant

Jonathan Lipke, Lieutenant Mark Levine, and Sergeant Adrian Santiago ("Defendants"),

discriminated against him on the basis of his race.  Defendants move for summary judgment on

all claims.

      For the following reasons, the motion for summary judgment is GRANTED.

## BACKGROUND

      The following facts are drawn from the parties' 56.1 filings and are undisputed except

where otherwise indicated.

---

[1] Plaintiff also brought a claim for relief under *Monell*, but voluntarily dismissed this claim "as redundant with Title VII and 8-107(13) for purposes of this action."  Dkt. No. 104 at 24.

### I.   The Relevant Parties

Plaintiff is an African American police officer who joined the New York City Police Department's Highway Division in January 2008.  Dkt. Nos. 95 ¶¶ 27, 28; 107 at 5 ¶¶ 27, 28. He joined Highway Unit 3.  Dkt. Nos. 95 ¶ 28; 107 at 5 ¶ 28.

Defendant Timothy Morgan ("Morgan") was appointed as Commanding Officer ("CO"), of Highway Unit 3 in November 2010, and left Highway Unit 3 in December 2014.  Dkt. Nos. 95 ¶ 3, 4; 107 at 1-2 ¶ 3, 4.  In this capacity, he was the highest-ranking officer in the command and had final authority over matters including assignments, shifts, and overtime.  Dkt. Nos. 95 ¶ 6; 107 at 2 ¶ 6.  In December 2014, Morgan became Executive Officer of the Highway District and remained in that role until he left the Highway District in October 2015.  Dkt. Nos. 95 ¶¶ 5, 9; 107 at 2 ¶¶ 5, 9.

Defendant John Sanford ("Sanford") became CO of Highway Unit 3 after Morgan left in December 2014, and he served in this capacity until he left the Highway District in April 2016. Dkt. Nos. 95 ¶¶ 11-12; 107 at 3 ¶¶ 11-12.

Defendant Sylvester Ge ("Ge"), joined the Highway District in January 2016, replacing Morgan; prior to that, he served as CO of IAB Group 27, which investigated allegations of serious misconduct in geographic areas that included Highway Unit 3.  Dkt. Nos. 95 ¶¶ 14-17; 107 at 3-4 ¶¶ 14-17; 96-2 at 10057.

Defendant Marc Levine ("Levine") is a supervisor at Highway Unit 3 and has been assigned to Highway Unit 3 since September 2006.  Dkt. Nos. 95 ¶¶ 18-19; 107 at 4 ¶¶ 18-19.

Defendant Jonathan Lipke ("Lipke") joined Highway Unit 3 in 2004 and was the Integrity Control Officer ("ICO") of Highway Unit 3 until he was transferred to Highway Unit 1 in 2018.  Dkt. Nos. 95 ¶¶ 21-23; 107 at 4 ¶¶ 21-23.  This role entailed overseeing overtime, court

appearances, and day-to-day integrity issues, and reviewing videos of officers' car stops.  Dkt. Nos. 95 ¶¶ 24-25; 107 at 4-5 ¶¶ 24-25.

## II.  Plaintiff's Experience at Highway Unit 3

Plaintiff alleges that after he "received a prestigious award from MADD in 2014,[2] for leading the NYPD in making DWI arrests, he was targeted by his supervisors who did not want to see a person of color excel at Highway."  Dkt. No. 104 at 2.

Plaintiff joined Highway Unit 3 in January 2008.  Dkt. Nos. 95 ¶ 28; 107 at 5 ¶ 28.  Highway Unit 3 has a variety of mechanisms for recording officer performance.  First, officers are evaluated annually and receive a score on their performance on a range from 1-5, with 5 being the highest.  Dkt. Nos. 95 ¶ 32; 107 at 6 ¶ 32.  Second, supervisors record minor procedure violations, which do not independently result in disciplinary action, in the minor violations log, noting the name of the person, the type of infraction, and whether any corrective action was taken.  Dkt. Nos. 95 ¶¶ 36-37; 107 at 6-7 ¶¶ 36-37.  Third, officers could receive a command discipline ("CD"), for an accumulation of minor violations or for individual more serious violations; a CD is "a written reprimand of varying levels . . . which if substantiated can lead to a penalty."  Dkt. Nos. 95 ¶¶ 38-39; 107 at 7 ¶¶ 38-39.  CDs are one of three levels: "A," which is the least serious, and can result in a penalty up to five vacation days; "B," which is more serious, and can result in a penalty up to ten vacation days; and "C," which is the most serious, and can result in a penalty up to fifteen vacation days.  Dkt. Nos. 95 ¶¶ 40-43; 107 at 7 ¶¶ 40-43.

If an officer declines to accept a CD penalty, charges and specifications—formal complaints in the NYPD's disciplinary process that can result in penalties ranging from written reprimand to termination—are issued.  Dkt. Nos. 95 ¶¶ 123-124; 107 at 25 ¶¶ 123-124.  One

---

[2] MADD stands for Mothers Against Drunk Driving.  The award was for showing outstanding efforts in eliminating drunk driving.  Dkt. No. 96-22, Ex. V.

such penalty includes dismissal probation; an officer on dismissal probation is monitored and can be terminated for any violation during the probationary period.  Dkt. Nos. 95 ¶ 176; 107 at 36 ¶ 176.

### A.    Plaintiff's Performance Record and Disciplinary History Prior to Receiving the MADD Award

Plaintiff received a 4 on his 2008 annual evaluation, and a 4.5 on his 2009 annual evaluation.  Dkt. Nos. 95 ¶¶ 31, 33; 107 at 6 ¶¶ 31, 33.

Plaintiff was placed in the minor violations log in June 2010 by Lipke for being off-post.  Dkt. Nos. 95 ¶ 35; 107 at 6 ¶ 35.  Plaintiff received a verbal warning from Lipke in October 2010 for having his marked police car, his RMP, parked outside of a personal residence while he was on duty; Plaintiff was not placed in the minor violations log or given a CD for this incident.  Dkt. Nos. 95 ¶¶ 45, 47; 107 at 8 ¶¶ 45, 47.  Plaintiff received a 4.5 rating on his 2010 annual evaluation.  Dkt. No. 95 ¶ 48; 107 at 8-9 ¶ 48.

Group 27, which investigated allegations of serious misconduct in geographic areas that included Highway Unit 3, substantiated three violations against Plaintiff in 2011, including being "unprepared for Traffic Violations Bureau Court in that he failed to appear with the Moving Violation Summons and his Departmental Activity Log," having "improper activity log entries for the issuance of the Summons," and "fail[ing] to safeguard his own copy of the Summons."  Dkt. Nos. 95 ¶ 49; 107 at 9 ¶ 49.  Plaintiff received, and accepted, a "B" CD for these violations, along with a penalty of three vacation days.  Dkt. Nos. 95 ¶ 50; 107 at 9 ¶ 50.  Plaintiff received a 4.5 rating on his 2011 annual evaluation.  Dkt. Nos. 95 ¶ 51; 107 at 9 ¶ 51.

In April 2012, Plaintiff was again placed in the minor violations log by Lipke for failing to sign out at court and was verbally reprimanded.  Dkt. Nos. 95 ¶ 52; 107 at 9 ¶ 52.  Plaintiff received a 4.5 on his 2012 annual evaluation.  Dkt. Nos. 95 ¶ 53; 107 at 9-10 ¶ 53.

In March 2013, Plaintiff received a CD for failing to sign in or out of court; subsequently, Morgan removed Plaintiff from the conditions post—which Morgan had assigned Plaintiff to in 2011—and returned him to regular patrol. Dkt. Nos. 95 ¶¶ 55-57, 59-60; 107 at 10 ¶¶ 55-57. This removal was only temporary; Morgan later returned Plaintiff to the DWI conditions post. Dkt. Nos. 95 ¶ 61; 107 at 11 ¶ 61. In October 2013, Santiago entered Plaintiff into the minor violations log, and gave him a verbal reprimand. Dkt. Nos. 95 ¶ 62; 107 at 11 ¶ 62. Plaintiff received a 4.5 on his 2013 annual evaluation. Dkt. Nos. 95 ¶ 63; 107 at 11 ¶ 63.

### III. Plaintiff's Performance Record and Disciplinary History After Receiving the MADD Award

In February 2014, Highway's STOP DWI Coordinator nominated Plaintiff for the MADD award; he received the award in March 2014 at a ceremony which Morgan attended. Dkt. Nos. 95 ¶¶ 64-66; 107 at 11 ¶¶ 64-66. "Plaintiff attributes his receipt of the MADD award to the decline in his relationships with his supervisors, increased scrutiny of his performance, and discipline for what he considers to be trivial matters." Dkt. Nos. 95 ¶ 67; 107 at 11-12 ¶ 67.

In March 2014, Inspector Paul Ciorra, who was CO of the Highway District, recommended Plaintiff for promotion to Detective Specialist. Dkt. Nos. 95 ¶ 69; 107 at 12 ¶ 69.

In June 2014, Lipke entered Plaintiff into the minor violations log for being out of uniform and for omitting an entry in his memo book, and Plaintiff was given a verbal warning and admonishment for these infractions. Dkt. Nos. 95 ¶¶ 71-72; 107 at 13 ¶¶ 71-72. Defendants note that Lipke "also placed white officers in the minor violations log for being out of uniform." Dkt. Nos. 95 ¶ 73; 107 at 13-14 ¶ 73. Later in June, Plaintiff was again entered into the minor violations log for failing to use his mobile vision. Dkt. Nos. 95 ¶ 74; 107 at 14 ¶ 74. Defendants note that Plaintiff's partner, who is Caucasian, was also placed in the minor violations log for the same violation. Dkt. Nos. 95 ¶¶ 75-76; 107 at 14 ¶¶ 75-76. Plaintiff also received an "A" CD

from Lipke in June 2014 for being off-post and for failing to properly monitor his department radio; Morgan adjudicated the CD and substantiated the claim that Plaintiff failed to notify the Highway Bureau desk after signing out of court.  Dkt. Nos. 95 ¶¶ 77-78; 107 at 14 ¶¶ 77-78.  As a penalty for this CD, Plaintiff's assignment was changed again and he was returned to patrol and assigned to day tours.  Dkt. Nos. 95 ¶ 79; 107 at 14-15 ¶ 79.  Plaintiff claims that this day tour–only assignment impacted his ability to spend time with his children and that Morgan was aware that Plaintiff has children; Defendants assert that Morgan was not aware that Plaintiff had childcare obligations.  Dkt. No. 107 at 14-15 ¶¶ 79-80.  Sanford did not return Plaintiff to his conditions post after his reassignment and asserted that this was because Plaintiff was frequently off-post.  Dkt. Nos. 95 ¶ 81; 107 at 15 ¶ 81.  In both July 2014 and August 2014, Plaintiff was entered into the minor violations log for being late for roll call.  Dkt. Nos. 95 ¶ 87; 107 at 16 ¶ 87.

Lipke asserts that in July and August of 2014, he received a series of calls from Queens Assistant District Attorneys ("ADAs"), regarding Plaintiff's behavior; Plaintiff denies that these calls occurred and says that there are no non-hearsay documents supporting Lipke's assertions. Dkt. Nos. 95 ¶¶ 88-94; 107 at 16-18 ¶¶ 88-94.  In July 2014, Lipke allegedly received a call from Shlomit Metz, a Queens ADA, saying that Plaintiff was not cooperating regarding his testimony and affidavit in his assigned case, and that he disappeared from court without authorization repeatedly; Lipke met with Plaintiff and verbally instructed him regarding these issues.  Dkt. Nos. 95 ¶¶ 88-90; 107 at 16-17 ¶¶ 88-90.  Lipke received another complaint from an ADA in July 2014 that Plaintiff was being difficult about signing an affidavit and again instructed Plaintiff regarding this issue.  Dkt. No. 95 ¶ 91.  Lipke received a third call from an ADA in August 2014, complaining that Plaintiff disappeared from court without authorization and

behaved unprofessionally when confronted about this; again, Lipke verbally instructed Plaintiff regarding this issue, and Plaintiff admits that this verbal instruction took place.  Dkt. Nos. 95 ¶¶ 92-94; 107 at 17-18 ¶ 94.  In August 2014, a female motorist complained that Plaintiff had touched her; Group 27 opened an investigation into her complaint.  Dkt. Nos. 95 ¶¶ 95-96; 107 at 18 ¶¶ 95-96.  Plaintiff asserts that the complaint was found to be unsubstantiated by the NYPD's Internal Affairs Bureau.  Dkt. No. 107 at 18 ¶ 95.  Plaintiff received a 4 on his 2014 annual evaluation.  Dkt. Nos. 95 ¶ 97; 107 at 18 ¶ 97.

In January 2015, Sanford substantiated an "A" CD that Group 27 had issued against Plaintiff in December 2014 for failure to be prepared for Traffic Violations Bureau court by failing to testify and failing to bring a copy of the moving violation, summons, and his memo book.  Dkt. Nos. 95 ¶¶ 107-109; 107 at 22-23 ¶¶ 107-109.  In April 2015, Sanford substantiated a "B" CD that Group 27 had issued against Plaintiff in July 2014 for failure to activate his vehicle's camera during a prisoner transport and to voucher a vehicle for forfeiture in February of 2014; Sanford issued a penalty of three vacation days for this CD.  Dkt. Nos. 95 ¶¶ 100-112; 107 at 23 ¶¶ 110-112.  Plaintiff's partner that day, who is Caucasian, was also issued a "B" CD and a penalty of three vacation days.  Dkt. Nos. 95 ¶¶ 114-115; 107 at 24 ¶¶ 114-115.  In April 2015, Plaintiff was placed in the minor violations log for failing to timely submit a summons and was warned and admonished for this violation.  Dkt. Nos. 95 ¶¶ 116-117; 107 at 24 ¶¶ 116-117. Lipke also placed Caucasian officers in the 2015 minor violations log for the same infractions. Dkt. Nos. 95 ¶ 118; 107 at 24 ¶ 118.  In May 2015, Lipke issued a "B" CD to Plaintiff for failing to present his activity log entries and for being insubordinate and belligerent; Sanford substantiated the CD in August 2015 and recommended a penalty of one vacation day, but

Plaintiff declined to accept any disciplinary action without a disciplinary hearing.  Dkt. Nos. 95 ¶¶ 119-122; 107 at 24-25 ¶¶ 119-122.

In May 2016, Plaintiff filed a complaint of race discrimination with the NYPD's Equal Employment Opportunity ("EEO") division, alleging that Lipke discriminated against him by "singling him out, by prohibiting [him] from working in certain areas, and by not allowing [him] to use an unmarked vehicle."  Dkt. Nos. 95 ¶¶ 126-127; 107 at 26 ¶¶ 126-127.  In July 2015, Levine issued a "B" CD to Plaintiff for failing to timely process an arrest; Sanford substantiated the CD in August 2015 and again recommended a penalty of one vacation day, but Plaintiff again declined to accept the penalty without a hearing.  Dkt. Nos. 95 ¶¶ 135, 138-139; 107 at 28-29 ¶¶ 135, 138-139.  Additionally, in July 2015, Levine received calls from an ADA and a paralegal saying that they could not reach Plaintiff for an extended period of time and that he was late in sending them an affidavit; Plaintiff admits that these calls occurred, although he denies that the assertions are true.  Dkt. Nos. 95 ¶¶ 136-137; 107 at 28-29 ¶ 136-137.  Levine also placed Plaintiff in the minor violations log for excessive time handling an accident report.  Dkt. Nos. 95 ¶ 147; 107 at 30 ¶ 147.  In November 2015, an "A" CD was substantiated against Plaintiff for failing to document his equipment properly; Plaintiff admits the violation.  Dkt. Nos. 95 ¶¶ 148-149; 107 at 31 ¶¶ 148-149.  Plaintiff received a 3.5 on his 2015 annual evaluation; he appealed the evaluation, but his appeal was denied.  Dkt. Nos. 95 ¶¶ 151, 155; 107 at 31-32 ¶¶ 151, 155.

In February 2016, Plaintiff was served with charges and specifications related to his November CD.  Dkt. Nos. 95 ¶ 156; 107 at 32 ¶ 156.  On March 2016, Plaintiff filed another complaint with NYPD's EEO division for retaliation, alleging that Santiago gave him a poor evaluation in retaliation for his prior EEO complaint; Plaintiff supplemented his complaint in

April to allege that Sanford denied him a tour change and denied the appeal of his evaluation in retaliation for his prior EEO complaint.  Dkt. Nos. 95 ¶¶ 157-159; 107 at 32 ¶¶ 157-159.  In June 2016, Santiago issued Plaintiff an "A" CD for failing to acknowledge radio calls and for being late to roll call; the charges were substantiated in June 2016, and Ge recommended a penalty of five days, which Plaintiff declined to accept without a disciplinary hearing.  Dkt. Nos. 95 ¶¶ 160-162; 107 at 32-33 ¶¶ 160-162.

Plaintiff filed this lawsuit in June 2016.  Dkt. No. 1.  In August 2016, Plaintiff was issued charges and specifications stemming from an alleged physical altercation with his girlfriend while off-duty; he was arrested for the same incident, and placed on modified duty because of the arrest, but criminal charges were ultimately dismissed.  Dkt. Nos. 95 ¶¶ 166, 168-169; 107 at 33-34 ¶¶ 166, 168-169.  In November 2016, Plaintiff was served with charges and specifications from his May 2015, July 2015, and June 2016 CDs; these were later amended, in April 2017, to include a May 2016 CD.  Dkt. Nos. 95 ¶¶ 170-171; 107 at 34 ¶¶ 170-171.

A departmental hearing was held on Plaintiff's various charges and specifications; the Assistant Deputy Commissioner of Trials ("ADCT"), issued a report and recommendation finding plaintiff guilty of failing to properly document his activity logs in August 2014, guilty regarding the altercation with his girlfriend in August 2016, guilty of being discourteous to a superior officer in May 2015, guilty of failing to remain alert while on duty in July 2015, and guilty of failing to monitor his radio in May 2016.  Dkt. Nos. 95 ¶ 173; 107 at 34-35 ¶ 173.  The report and recommendation also found plaintiff not guilty of attempting to interfere with the departmental investigation in February 2017, of failing to make accurate entries in his activity log in May 2015, and of being absent from assignment in June 2016.  Dkt. Nos. 95 ¶ 173; 107 at 34-35 ¶ 173.  The ADCT found that there was no racial bias in the underlying disciplinary

actions.  Dkt. Nos. 95 ¶ 174; 107 at 35 ¶ 174.  The ADCT recommended a penalty of a 31-day

suspension, loss of 20 vacation days, and one year of dismissal probation.  Dkt. Nos. 95 ¶ 175;

107 at 35 ¶ 175.  In September 2018, then–NYPD Commissioner James P. O'Neill approved the

disposition of the charges.  Dkt. Nos. 95 ¶ 177; 107 at 36 ¶ 177.  Plaintiff filed an Article 78

Verified Petition seeking to reverse the ADCT's decision in January 2019, again asserting that

this entire process was discriminatory and retaliatory; the Appellate Division of the First

Department found that the sustained charges were supported by substantial evidence and that the

penalty was not disproportionate.  Dkt. Nos. 95 ¶ 181; 107 at 36 ¶ 181.

### IV. Plaintiff's Allegations of Racial Bias

As noted above, Plaintiffs claims of racial bias center around his belief that after he

"received a prestigious award from MADD in 2014, for leading the NYPD in making DWI

arrests, he was targeted by his supervisors who did not want to see a person of color excel at

Highway."  Dkt. No. 104 at 2.

Plaintiff alleges, and Defendants admit, that for many years while Plaintiff was at

Highway Unit 3, he was the only African American patrol officer in that unit.  Dkt. Nos. 107 at

37 ¶ 3; 115 at 37-38 ¶ 3.  He further alleges that the number of African Americans in Highway

Unit 3 was disproportionately low compared to the number of African Americans in Highway

overall, which was disproportionately low relative to the number of African Americans in the

entire NYPD; he alleges that this was due to the "practice of the NYPD as it pertains to assigning

Officers to . . . the elite Command Highway and as to Highway Unit 3," which "resulted in

exclusion of African American officers from its ranks."  Dkt. No. 107 at 37 ¶¶ 1-2.

Plaintiff further alleges that beginning in 2014, he was targeted by his supervisors.

Specifically, he notes and Defendants admit that in 2014, Highway Unit 3 issued 38 minor

violations, six of which were issued to Plaintiff; he further alleges that he received far more

verbal reprimands, minor log violations, and CDs after his receipt of the MADD award than he did prior to it.  Dkt. Nos. 107 at 37-38 ¶¶ 5-8; 115 at 38-39 ¶¶ 5-8.  He alleges that one CD and one minor violation were issued after his receipt of the MADD award for underlying events that occurred years earlier.  Dkt. No. 107 at 38 ¶¶ 9-10.

Plaintiff also relies heavily on the testimony of non-party Valentin Khazin, a sergeant who was one of Plaintiff's other supervisors.  Khazin testified that Plaintiff was treated differently than his peers, including receiving more stringent supervision, being required to obtain approvals to take a day off that others were not required to obtain, and being subjected to certain rules and discipline for violations of those rules; he declared that Khazin's superiors, including Defendants Sanford and Levine ordered Khazin to give Plaintiff "endless work," directed him not to give Plaintiff any days off without approval from Defendant Lipke or Lt. Brathwaite; and he further testified that he was informed that Plaintiff's requests for days off would be refused as much as possible.  Dkt. No. 107 at 38-39 ¶¶ 11-14.  Defendants deny the accuracy of this testimony, and in some instances deny that Khazin testified to this at all.  Dkt. No. 115 at 39-41 ¶¶ 11-14.

Plaintiff further alleges that when he was assigned to day tours only, this meant that he, "unlike similarly situated Caucasian officers, was not allowed to choose his tours, which impacted his family life, as when he still worked nights he could see his two daughters during the day."  Dkt. No. 107 at 40 ¶ 18a.[3]  He alleges that "various white officers came into Highway Patrol and had less time than him and were given their choice of tours of duty and he was not," but "admits that he cannot name any officers and does not know the disciplinary history of other

---

[3] Plaintiff's 56.1 statement includes two paragraphs on page 40 labeled "18."  For clarity, the Court refers to the first as 18a and the second as 18b.

officers." Dkt. Nos. 95 ¶ 82; 107 at 15 ¶ 82. Defendants deny this allegation and argue that there is no evidence in the record of other officers' requests for specific tour schedules. Dkt. No. 115 at 42 ¶ 18a.

Plaintiff further alleges that his "ability to perform the functions of his job, his opportunities for promotion, and his earnings were negatively impacted by discriminatory treatment." Dkt. No. 107 at 40. Specifically, he alleges that he was excluded from presidential motorcades, which reduced his ability to earn overtime. Dkt. No. 107 at 40 ¶ 18b. Plaintiff did not specifically request to be assigned to presidential motorcades, but was assigned to them in May, September, and October 2014. Dkt. No. 95 ¶ 99; 107 at 19 ¶ 99. However, Plaintiff was removed from one motorcade, for the U.S. women's soccer team; he asserts that this was discriminatory, and that Morgan, who removed him, called him a "cancer" and "boob" and did not want him to be "the face of Highway." Dkt. No. 107 at 19 ¶ 100. Defendants assert that he was removed for administrative reasons—he was never assigned to the motorcade, but he was the operator for a sergeant who was supposed to be in the motorcade; when she was removed, that meant that Plaintiff was too "because he remained with Sgt. Maduros." Dkt. No. 95 ¶ 101. Plaintiff further alleges that his overtime was generally lower during the period after he received the MADD award, as a result of his being targeted and because he was removed from his DWI post and night tour, both of which affect potential overtime pay. Dkt. No. 107 at 40 ¶ 19. Plaintiff cites Khazin's testimony that Plaintiff was "purposefully subjected to practices intended to lower his productivity and effectiveness as a Highway Officer," including being required to work a specific post, being frequently called back to the precinct, not being given the same amount of time as other officers to review his summonses and prepare for traffic court, and not being allowed to collect his summonses. Dkt. No. 107 at 40-41 ¶ 22. Defendants deny each of

these allegations and argue that there is no evidence in the record to support them, and in particular to indicate practices with regard to other officers. Dkt. No. 115 at 43 ¶ 22. Plaintiff also alleges that he was "denied the normal protection and treatment afforded to officers who had been subjected to violence at the hands of violet [sic] arrestees, and was required to drive an [sic] belligerent motorist to the precinct, despite the fact that he had been injured in the course of the arrest," and that "not only was he denied immediate medical care, his return to light duty became an excuse for increased scrutiny and unfair disciplinary actions." Dkt. No. 107 at 41 ¶¶ 23-24. Defendants deny these allegations and again argue that there is no evidence in the record about the "normal protection and treatment afforded to" other officers. Dkt. No. 115 at 43-44 ¶¶ 23-24. Last, Plaintiff alleges that "among the actions taken to prevent him from doing his job is that he was given cars that were unfit for the purpose of high speed driving, endangering his safety and preventing him from policing speeding motorists effectively." Dkt. No. 107 at 44 ¶ 25.

Although Plaintiff alleges that his targeting began in 2014, he asserts that several events prior to this were also discriminatory; for example, he says that Morgan's "sole motivation for removing [him] from his conditions post [in 2013] was to inhibit his ability to do what he was excelling at and was better at than any other Highway Officer, getting drunk drivers off the road." Dkt. No. 107 at 10-11 ¶ 59. Plaintiff further alleges that Morgan specifically "targeted [him] undeservedly," and that Morgan's "dislike for African Americans is also documented by non party witnesses, including Sergeant Andre Sce." Dkt. No. 107 at 20-21 ¶ 105.

**PROCEDURAL HISTORY**

Plaintiff filed his first complaint in the instant matter on June 30, 2016. Dkt. No. 1. The case was referred to mediation, which was then stayed after the NYPD served Plaintiff with disciplinary charges on November 1, 2016. Dkt. No. 40. After the case was again referred to

mediation, Plaintiff filed an amended complaint on February 16, 2018.  Dkt. No. 50.  The case

was stayed on February 13, 2019 pending resolution of Article 78 proceedings, Dkt. No. 80, and

the stay was lifted on June 10, 2020, after the Article 78 proceedings resolved, Dkt. No. 84.  This

motion for summary judgment was filed on October 9, 2020.  Dkt. No. 94.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008),

and the movant bears the burden of demonstrating that "no genuine issue of material fact exists,"

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation

omitted).  Nor may the non-moving party "rely on conclusory allegations or unsubstantiated

speculation."  *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).  Rather, to

survive a summary judgment motion, the opposing party must establish a genuine issue of fact

by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also*

*Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary judgment,

the non-moving party must demonstrate more than "some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on

conclusory statements, or on mere assertions that affidavits supporting the motion are not

credible." *Gottlieb v. Cnty. Of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation

omitted).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is

merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is

rare and such intent must often be inferred from circumstantial evidence found in affidavits and

depositions." *Chiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting

*Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d. Cir. 2001)) (internal citation omitted).

However, "the salutary purposes of summary judgment—avoiding protracted, expensive and

harassing trials—apply no less to discrimination cases than to . . . other areas of litigation."

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*,

759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently

from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more

than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at

137.

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how

the facts relied upon by the moving party and disputed by the opposing party are to be presented.

Any party moving for summary judgment must "annex[ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c).

**DISCUSSION**

## I.       Title VII, § 1983, and NYCHRL Claims

Defendants move for summary judgment on Plaintiff's claims under Title VII, § 1983, and the NYCHRL. Plaintiff brings three categories of claims under these statutes: claims of race-based disparate treatment, claims of retaliation, and claims of a hostile work environment.

### A. Adverse Employment Discrimination

Claims of adverse employment discrimination under Title VII, Section 1983, and the NYCHRL are governed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this standard, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving

rise to an inference of discrimination.  *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d

Cir. 2010) (Title VII); *Naumovski v. Norris*, 934 F.3d 200, 214-15 (2d Cir. 2019) (Section 1983).

"Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a

legitimate nondiscriminatory reason for the termination.  If defendant does so, the burden returns

to the plaintiff to show that the real reason for [the adverse action] was his [protected status]."

*Ruiz*, 609 F.3d at 492.

In employment discrimination cases, the burden of establishing a prima facie case is

"minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v.

Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).  However, a plaintiff cannot establish a prima

facie case based on "purely conclusory allegations of discrimination, absent any concrete

particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert denied*, 474 U.S. 829 (1985).

There is no dispute that Plaintiff, as an African American, is a member of a protected

class.  It is similarly undisputed that Plaintiff was qualified for the position he held.  Regarding

the third criteria, it is undisputed that Plaintiff suffered some adverse employment actions,

including failure to be promoted and receipt of CDs that carried with them loss of vacation days.

However, not all of the instances of disparate treatment that Plaintiff alleges constitute adverse

employment actions.  Moreover, Plaintiff has not met his minimal burden to put forth evidence

suggesting an inference of discriminatory motivation for those actions.  *See Littlejohn v. City of

N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015).  Even if there were such an inference, Defendants have

proffered evidence of legitimate, nondiscriminatory reasons for these actions, and Plaintiff has

failed to offer evidence that those reasons were pretextual.

### 1.   Adverse Employment Actions

A plaintiff suffers an adverse employment action when he "endure[s] a materially adverse

change in the terms and conditions of employment."  *Brown v. City of Syracuse*, 673 F.3d 141,

150 (2d Cir. 2012). Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 22 (2d Cir. 2015). "Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions within the meaning of Title VII." *La Grande v. DeCrescente Distributing Co., Inc.*, 370 F. App'x 206, 211 (2d Cir. 2010).

It is undisputed that certain of the actions Defendants took towards Plaintiff, such as the failure to promote him and the delivery of CDs, constituted adverse employment actions. Defendants assert, however, that some of the other challenged actions, including not being assigned as frequently to presidential motorcades, removal from the U.S. women's soccer team motorcade, removal from DWI conditions post, restriction from Steven McDonald's driver detail, increased monitoring, placement in the minor violations log, and annual evaluations, do not constitute adverse employment actions. Dkt. No. 97 at 8-18. Plaintiff's brief in opposition does not articulate his position on each of these and simply states: "Turning to the third criteria the adverse employment criteria is met by the plethera [sic] of actions discussed fully within the Statement of Facts and in Plaintiff's Statement Pursuant to Local Rule 56.1." Dkt. No. 104 at 16. The Court addresses each of these actions in turn.

Many of the challenged actions, including Plaintiff's assertions that he was not assigned to presidentials, was removed from the U.S. women's soccer team motorcade, was removed from the DWI conditions post, and was restricted from Steven McDonald's driver detail, all fall into one category: unsatisfactory work assignments. "It is well-established that subjective dissatisfaction with assignments does not constitute adverse employment action." *Harrison v. N.Y.C. Off-Track Betting Corp.*, 2001 WL 1154691, at *3 (S.D.N.Y. Sept. 28, 2001); *see also*

*Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) ("[A] change in job responsibilities is not necessarily an adverse employment action.  Neither is underutilization of Plaintiff's skills." (internal citation omitted)); *Moschetti v. N.Y.C. Dep't of Educ.*, 2018 WL 4759787, at *15 (S.D.N.Y. Sept. 28, 2018) (finding that mere dissatisfaction with assignments is insufficient to constitute an adverse employment action); *Joseph v. Thompson*, 2005 WL 3626778, at * 6 (E.D.N.Y. Mar. 23, 2005) ("The fact that plaintiff did not receive what he considers to be a sufficient number of assignments in an area that he prefers does not by itself constitute an adverse employment action."); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("It is well-settled that a lateral transfer does not rise to the level of an adverse employment action as a matter of law.").  Standing alone, unsatisfactory work assignments and changes in job responsibilities do not constitute adverse employment actions; "[t]o be an adverse employment action, these actions must be accompanied by materially adverse changes in employment, such as a demotion or a loss of wages."  *Hill*, 467 F. Supp. 2d at 352.  In other words, unsatisfactory work assignments and changes in job responsibilities only rise beyond the level of workplace grievances to become adverse employment actions if they are accompanied by material changes in the terms and conditions of employment that would themselves constitute adverse employment actions.  *See, e.g.*, *Moschetti*, 2018 WL 4759787, at *15 (holding that a teacher being "moved from classroom to classroom, doing nothing" instead of being given a "regular assignment," which "arguably underutilized Plaintiff's skills," was not an adverse employment action because there were no allegations or evidence about "how her terms of conditions of employment changed," or that "her salary, benefits, promotion potential, or any other material measure of her employment status changed"); *Henry v. NYC Health  Hosp. Corp.*, 18 F. Supp. 3d 396, 405 (S.D.N.Y. 2014) (holding that where plaintiff was "removed from the

roll call and sent home," but "does not allege that she was docked pay on that particular day, or that any disciplinary proceeding followed," there is no indication that plaintiff "suffered any materially adverse change in the conditions of her employment" and thus "[t]his incident is properly classified as a mere inconvenience or embarrassment"); *Johnson v. Morrison & Foerster LLP*, 2015 WL 845723, at *5 (S.D.N.Y. Feb. 26, 2015) (holding that where plaintiff alleged "that he was assigned fewer or less satisfying tasks," but had not "proffer[ed] indicia of material disadvantage," this was "insufficient to make out an adverse employment action"); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (holding that where plaintiff was transferred to another office that "resulted in a longer commute—which is an inconvenience," but "retained the same position, the same responsibilities, and the same salary and benefits," there was no adverse employment action);  *Mazyck v. Metropolitan Transp. Auth.*, 893 F. Supp. 2d 574, 589 (S.D.N.Y. 2012) (finding that allegation that plaintiff was "denied opportunities for overtime," where others were given assignments that led to overtime but he was denied the same opportunities, "satisfies the [adverse employment action] prong of his *prima facie* case, as denial of overtime can constitute an adverse employment action").  Thus, for each of Plaintiff's claims that he received unsatisfactory work assignments and that these constituted adverse employment actions, the central question is whether these actions were accompanied by material changes in the terms and conditions of his employment.

First, the Court need not reach this question with regard to Plaintiff's assertions that "he has received almost no motorcade time in presidentials" and that "[w]hite officers who are similarly situated to Harge regularly receive time in motorcades and presidentials," because the evidence cannot support a finding that this happened at all.  Dkt. No. 50 ¶¶ 40, 42.  It is undisputed both that Plaintiff did not request to be in presidential motorcades while Morgan was

CO and that Plaintiff was assigned to presidential escorts in May, September, and October 2014.

Dkt. No. 107 at 19 ¶¶ 98-99.  Plaintiff claims, in his statement of undisputed facts, that his

"partial exclusion from prestigious Presidentials reduced his ability to earn overtime as other

officers in the Unit routinely did."  Dkt. No. 107 at 40 ¶ 18b.  To support this assertion, Plaintiff

points only to his own testimony asserting the same.  *See id.* (citing Ex. 2 at 276:9-14).  But

Plaintiff's testimony is both conclusory and contradictory:

> Q:      Okay. And did you get presidentials on a regular basis, when you were in Highway Unit 3?
> A:      No.
> Q:      And how is it decided who gets the presidentials, if you know?
> A:      How is it decided?
> Q:      Yes.
> A:      Well, I -- I don't know how. . . . I did not get chosen to be in any presidentials.
> Q:      In any presidentials?
> A:      No.
> Q:      How often did you do presidentials?
> A:      Numerous times a month.
> Q:      You did presidentials, numerous times a month?
> A:      Correct.
> Q:      You did?
> A:      Correct.
> …
> Q:      Do presidentials lead to overtime?
> A:      Yes.
> Q:      And did you get as much overtime for presidentials as -- from what you observed the other officers on Highway?
> A:      No.
> Q:      Was it substantially more, substantially less, or something else?
> A:      It was -- substantially -- was getting substantially less than the other officers.

Dkt. No. 120 at 274-76.  Plaintiff points to no evidence in the record, and the Court finds none,

supporting Plaintiff's assertion that he received less overtime for presidentials or was partially

excluded from presidentials, or indicating how frequently similarly situated officers were

assigned to presidential escorts.  Nor does Plaintiff provide any evidence of presidentials that he

wanted to be assigned to but was not assigned to.  As such, Plaintiff's assertion that he was

partially excluded from presidentials is not supported by the record, or even by his own conclusory and contradictory testimony. *See Baptiste v. Cushman & Wakefield*, 2007 WL 747796, at *7 (S.D.N.Y. Mar. 7, 2007) ("Plaintiff's mere subjective belief she was discriminated against because of her race, oft-expressed in her deposition testimony on the subject, cannot sustain a charge of race discrimination." (citing *Holt v. KMI-Cont'l*, 95 F.3d 123, 129 (2d Cir. 1996))); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (holding that where "plaintiffs rely almost exclusively on their own deposition testimony in order to support their claims," and where "the only 'evidence' cited in plaintiffs' brief is their own self-serving testimony" that is "speculative, and subjective," and not squared with the record, "[s]uch evidence is insufficient to defeat summary judgment"). The Court need not consider whether Plaintiff's exclusion from presidentials was an *adverse* employment action, because there is no evidence indicating that such an action occurred at all.

Second, Plaintiff asserts that he was removed from the U.S. women's soccer team motorcade. His complaint alleges that his "squad supervisor chose him to be her driver for the US Women's Soccer Team ticker tape parade," that "[u]pon his arrival at the location, as Captain Morgan observed Harge driving lead car with his Sergeant, Morgan immediately confronted the Sergeant and asked her how dare she bring Harge to the detail," that "Morgan said that Harge is a 'cancer' and a 'boob' and Capt. Morgan then replaced both of them with a white Sergeant from Highway 1." Dkt. No. 50 ¶¶ 164-167. The only evidence in the record before the Court to support these allegations is a report of an interview with Madouros, the sergeant who was also

removed from the soccer motorcade.  Dkt. No. 112-12, Ex. 28.  The write-up of the report

includes the following statement: "Madouros has Harge as her driver to lead the parade for the

Women's soccer team, when Capt. Morgan (now XO of Highway District) saw them and told

Madouros why did she bring that 'cancer' and that 'boob' to the detail, referring to Harge.

Madouros told Morgan that she is not familiar with Manhattan and brought Harge because he

knows the streets of Manhattan."  *Id.*  Plaintiff asserts that he has a recording of these statements,

Dkt. No. 107 at 19-20 ¶ 100, but that recording is not in the record before the Court on this

motion.  Morgan, in his deposition, stated that he never referred to Plaintiff as a "cancer" or a

"boob."  Dkt. No. 104-6, Ex. 6, at 94-95.  Construing this conflicting evidence in the light most

favorable to Plaintiff, the non-moving party, the evidence does indicate a genuine dispute as to

whether these events occurred.  However, Plaintiff does not allege in his complaint or in his 56.1

statement that this removal led to a decrease in pay, significantly diminished responsibilities, or

any material changes in the terms and conditions of his employment that would elevate it beyond

a mere workplace grievance; as such, it does not constitute an adverse employment action.

Third, Plaintiff points to his removal from his DWI conditions post.  Plaintiff asserts that

this removal limited his potential for overtime pay, thus affecting his salary, and that "his

subsequent removal from night tour . . . took away both his night differential pay and his ability

to make DWI arrests, [which] can result in overtime."  Dkt. No. 107 at 40 ¶ 21.  Diminished

responsibilities and decreased pay, including denial of opportunities for overtime, are material

changes in the terms and conditions of employment that are reflective of an adverse employment

action; as such, construed in the light most favorable to Plaintiff, his removal from his DWI

conditions post does constitute an adverse employment action.

Fourth, Plaintiff alleges that he was restricted from a particular assignment, of driving Detective Steven McDonald.  Dkt. No. 50 ¶¶ 118-120.  Defendants state that "Captain Sanford . . . removed plaintiff from Steven McDonald's driving detail because he discovered that there were days where plaintiff was assigned to Steven McDonald when he did not require a driver and plaintiff would not report to work."  Dkt. No. 95 ¶ 134.  Plaintiff asserts that "the reason given for the removal is a pretext as there is no evidence in the entire record of plaintiff not reporting to work."  Dkt. No. 107 at 28 ¶ 134.  Regardless of the reason for Plaintiff's restriction from this assignment, this restriction does not constitute an adverse employment action because Plaintiff does not offer evidence that this restriction in any way affected his salary or benefits, or materially impacted the conditions of his employment.  Plaintiff merely did not receive an assignment that he wanted, which may constitute a workplace grievance but does not rise to the level of an adverse employment action.

 The remainder of the challenged actions are not unsatisfactory assignments, but rather relate to increased scrutiny and negative evaluations.  Increased monitoring has been repeatedly found not to constitute an adverse employment action because it does not change the terms and conditions of employment.  *See, e.g.*, *Weisman v. N.Y.C. Dep't of Educ.*, 2005 WL 1813030, at *10 (S.D.N.Y. Aug. 1, 2005) ("[A]ccepting as true her assertion that she was subjected to increased monitoring, such supervision does not, without more, constitute an adverse employment action."); *Morrison v. Potter*, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005) ("Although . . . close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions." (quoting *Castro v. N.Y.C. Bd. of Educ. Personnel*, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998))); *Hill*, 467 F. Supp. 2d at 354-55 ("Excessive scrutiny, without more, does not constitute

an adverse employment action."); *Lawson v. N.Y.C. Bd. of Educ.*, 2011 WL 869282, at *17 (S.D.N.Y. Feb. 25, 2011) ("Increased monitoring is not an adverse employment action, however, because it does not alter the terms and conditions of employment.").  As such, Plaintiff's allegation that he was subjected to increased monitoring and scrutiny by his supervisors does not constitute an adverse employment action.

Last, it is undisputed that Plaintiff was placed into the minor violations log on many occasions and received lower ratings on some of his annual evaluations.  "Reprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action, . . . and whether they do is typically a question of fact for the jury.  However, where there is no evidence that would support a finding that a reprimand has an impact on the terms and conditions of employment, it appears that the reprimand does not constitute an adverse employment action." *Lawson*, 2011 WL 869282, at *18 (quoting *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010)) (internal quotation marks and citations omitted).  Similarly, "[n]egative performance evaluations do not constitute adverse employment actions," *Hill*, 467 F. Supp. 2d at 353 n.18, although "[a] negative evaluation accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action," *Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381, 402 (S.D.N.Y. 2008); *see also Bernstein v. N.Y.C. Dep't of Educ.*, 2020 WL 6564809, at *6 (S.D.N.Y. Nov. 9, 2020).  Here, none of the incidents in which Plaintiff was written up in the minor violations log led to any tangible negative consequences beyond verbal reprimands, warnings, and admonishments, and there were no tangible negative consequences associated with his ratings on his annual evaluations.[4]  As

---

[4] Plaintiff asserts, without support from the record, that his rating of 4 on his 2014 annual evaluation (as opposed to the 4.5 rating he received on several previous evaluations) "directly impacted [his] promotion prospects negatively."  Dkt. No. 107 at 18 ¶ 97.  However, no evidence

such, neither Plaintiff's placement in the minor violations log nor his lower evaluations constitute adverse employment actions.

### 2. Discriminatory Motivation

Once Plaintiff has established adverse employment actions—here, his failure to be promoted, receipt of CDs, and removal from his conditions post—he must put forth evidence suggesting an inference of discriminatory motivation for these actions, and if Defendants, in response, point to evidence of legitimate, nondiscriminatory reasons for those actions, he must offer evidence that those reasons were pretextual. *Ruiz*, 609 F.3d at 492. The Court considers these steps in turn.

### a. Evidence Suggesting an Inference of Discrimination

First, Plaintiff alleged in his complaint that he was recommended for a promotion to Detective Specialist in March 2014 but that "his promotion was shelved . . . due to his race." Dkt. No. 50 ¶¶ 55, 200. Specifically, he alleged that "Sergeant Sce was assigned to write up the request because the other supervisors knew that Captain Morgan would not put Harge in for a promotion because Harge is black," that "[w]hen Captain Morgan found out that Harge was up for a promotion, he began taking action against him, making certain his future in Highway Patrol would be down hill from that point forward," that "Morgan openly stated that he not only would make sure Harge would not get the Detective's Shield, but that he would get Harge completely out of Highway Patrol," and that "Harge's recommendation for Detective Specialist was placed in a folder, but then mysteriously disappeared, in violation of departmental procedure; and it never reached the Chief of Transportation who would have been responsible for acting on it." *Id.* ¶¶ 56-59. In response to the motion for summary judgment, the evidence that Plaintiff points to

in the record supports this conclusion.

in support of these allegations includes only his own declaration that his "application for the promotion apparently was never addressed by the NYPD," Dkt. No. 106 at 3, and Sergeant Sce's testimony.  Sce testified:

> A.      . . . I was also asked by Inspector Ciorra to write Officer Harge up for discretionary promotion for a very good designation of detective specialist, which is an acknowledgment of your hard work and integrity as an officer.  I can add one thing to that.  I was told to do it because Captain Morgan did not like black people.
>
> Q.      Who told you that?
>
> A.      That was told by Lieutenant Sallie to me.  I'm assigned to the highway district.  Officer Harge at this point is assigned to Highway 3.  We don't work together.  I'm not his supervisor.  There is no reason for me to write – he's a detective specialist for someone that doesn't work for me and someone that's not in my command.  That was being done and explained to me that I had firsthand knowledge of what it is to work for Morgan and I know best.  Therefore, they saw no person better than me to write this for Harge, because Captain Morgan would never let it occur.
>
> Q.      Who asked you to write this 49?  Was it a 49?
>
> A.      It was an application which part of it is a 49 and it's a background check.
>
> Q.      Who asked you to write this, Ciorra or Sallie?
>
> A.      Both.
>
> Q.      Who asked you to write it first?
>
> A.      Both of them spoke to me about it.  Lieutenant Sallie spoke to me more so than Inspector Ciorra.  Inspector Ciorra told me to write it up, to bring it to him, let him look it over, he's going to endorse it and I know firsthand that Morgan – what it is to work for Morgan and Morgan wouldn't sign it.

Dkt. No. 104-9, Ex. 15, at 246-47.

This testimony fails to support the inference that the failure to promote (i.e., the adverse action) took place under circumstances giving rise to an inference of discrimination.  Plaintiff offers no evidence that Sce's write-up of Plaintiff for promotion was influenced by what he claims he was told by Lieutenant Sallie about the reason Captain Morgan would not prepare the write-up.  From the record before the Court, it was a matter of indifference who prepared the

write-up.  Plaintiff was not disadvantaged in his opportunity for promotion because Sce prepared the write-up rather than Morgan nor was Sce's write-up affected adversely by what Morgan apparently believed.  For all the record reflects, Plaintiff may have been benefited by the fact that Sce prepared the write-up rather than Morgan.

Moreover, to the extent the testimony is offered as substantive evidence of Morgan's beliefs (rather than as evidence of Sce's state of mind *regarding* Morgan's beliefs), the evidence suffers from two defects.  First, it is hearsay.  What Plaintiff was told by Sce regarding what Sallie had told Sce about Morgan's statements or beliefs is not admissible for the truth of the matter of Morgan's statements or beliefs; at most it is admissible for what Sce believed about those beliefs.  *See U.S. v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (noting that hearsay is "a declarant's out-of-court statement 'offer[ed] to prove the truth of the matter asserted in the statement,'" but that "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay," such that "a statement offered to show its effect on the listener is not hearsay" (quoting Fed. R. Evid. 801(c) and 801(c) advisory committee's note)).  As importantly, there is no evidence that Morgan had any involvement in the promotion process at all—that Morgan ever saw the recommendation, that he expressed views about the promotion, that he had a decisionmaking role or spoke to those in a decisionmaking role, or that Morgan was involved with the promotion process at all.  *See Galimore v. City University of New York Bronx Community College*, 641 F. Supp. 2d 269, 284 (S.D.N.Y. 2009) (holding that verbal comments are evidence of discriminatory motivation when "plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision," and that factors to consider are "(1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-

worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark . . .; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process" (quoting *Silver v. North Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 362-63 (S.D.N.Y. 2007))); *Dixon v. Int'l Federation of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011) (noting, where an employment discrimination claim was based on a stray remark by someone "who played no role in [plaintiff's] termination," that "[w]e have long held that stray comments of this variety do not create an inference of discrimination"); *Cai v. Wyeth Pharmaceuticals, Inc.*, 2012 WL 933668, at *7 (S.D.N.Y. Mar. 19, 2012) ("[I]t has been settled that stray remarks by a non-decision maker are insufficient to establish a prima facie case of age discrimination."). Plaintiff claims that "it is unlikely that Defendant Morgan would be unaware of the document," but—absent more—that is pure speculation. Plaintiff cites no evidence to support this inference. Dkt. No. 107 at 12-13 ¶ 70. Morgan testified that he never saw the recommendation and did not play any role in this decision. Dkt No. 96-1, Ex. A, at 23-29. On the record before the Court, there is insufficient evidence to create an inference of discrimination regarding the failure to promote Plaintiff, because Plaintiff has proffered no evidence at all that Morgan was involved in this decision.

Second, Plaintiff received multiple CDs that led to various concrete penalties that could constitute adverse actions. However, Plaintiff has not proffered any evidence that these actions took place under circumstances that give rise to an inference of discrimination. Plaintiff's primary evidence consists of his own assertions that various CDs were discriminatory, would not have been issued to white officers, or were false. *See* Dkt. No. 107 at 23 ¶¶ 108-111; *see also Baptiste v. Cushman & Wakefield*, 2007 WL 747796, at *7 (S.D.N.Y. Mar. 7, 2007) ("Plaintiff's mere subjective belief she was discriminated against because of her race, oft-expressed in her

29

deposition testimony on the subject, cannot sustain a charge of race discrimination." (citing *Holt v. KMI-Cont'l*, 95 F.3d 123, 129 (2d Cir. 1996))); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (holding that where "plaintiffs rely almost exclusively on their own deposition testimony in order to support their claims," and where "the only 'evidence' cited in plaintiffs' brief is their own self-serving testimony" that is "speculative, and subjective," and not squared with the record, "[s]uch evidence is insufficient to defeat summary judgment").

Plaintiff also draws support from Khazin's testimony that Plaintiff "received more command disciplines than any other officer for more trivial matters." Dkt. No. 104-4 at 18.   But that general testimony is not enough alone to give rise to an inference of discrimination.  First, Khazin offered no basis for his testimony—there is no evidence that he would know how many CDs Plaintiff received or how many other officers received much less that he knew what the CDs were received for and how the CDs received by Plaintiff related to the conduct of other officers who did not receive CDs.   *See Davis v. N.Y.C. Transit Auth.*, 2008 WL 4962989, at *8 (S.D.N.Y. Nov. 14, 2008) (holding that plaintiff's claim of sex discrimination did not survive summary judgment where plaintiff asserted a claim of disparate treatment but "point[ed] to no circumstances that would suggest that the action taken against him by his employer would not have occurred in the case of a woman," and "cite[d] no example of a female employee engaging in similar behavior and not being disciplined," thus relying on only on conclusory assertions of animus); *Hess v. Mid Hudson Valley Staffco LLC*, 2018 WL 4168976, at *18 (S.D.N.Y. Aug. 30, 2018) (holding that in an age discrimination case where Plaintiff "argue[d] that other employees

received lesser discipline" for violations, but "does not identify who committed the [violations] or who the [other employees] are that received preferential treatment, let alone their positions, disciplinary background, or even the severity of their [violations]," summary judgment was warranted).  Moreover, the record is otherwise devoid of evidence of any examples where other officers were similarly situated to Plaintiff in that they engaged in the same conduct but did not receive CDs.  Notably, one of the CDs that Plaintiff believes was discriminatory was issued on July 28, 2014, for failure to activate his vehicle's camera.  Dkt. No. 95 ¶ 111.  Plaintiff states, in his response to Defendants' 56.1 statement, that "this CD was illegitimately issued by Defendant Ge as a discriminatory action, as it is his recollection that his vehicle's camera had likely been activated."  Dkt. No. 107 at 23 ¶ 111.  For this CD, Sanford issued Plaintiff a penalty of three vacation days; Defendants note, and Plaintiff admits, that "Plaintiff believed Capt. Sanford's actions to be discriminatory because he did not use his authority to lessen the penalty."  Dkt. Nos. 95 ¶¶ 112-113; 107 at 23-24 ¶¶ 112-113.  However, it is undisputed that Plaintiff's partner, who was Caucasian, was also given a CD of the same level for the same incident and issued the same penalty of three vacation days.  Dkt. Nos. 95 ¶¶ 114-115; 107 at 24 ¶¶ 114-115.  Thus, where the record does contain details of similar conduct by officers who were similarly situated except for the color of their skin, the record demonstrates that Plaintiff was not treated worse on the basis of the color of his skin.  *See also* Dkt. Nos. 95 ¶¶ 73-76, 83-86, 118; 107 at 14-15 ¶¶ 73-76, 15-16 ¶¶ 83-86, 24 ¶ 118.

Last, Plaintiff asserts that his removal from the conditions post, as well as his constant assignment to one specific post, post 301 and restriction from night duty, was discriminatory. Once again, Plaintiff fails to proffer any evidence to suggest that this was discriminatory beyond

conclusory statements to the same effect by both himself and Khazin.  *See* Dkt. No. 107 10-11 ¶¶ 59-61, 14-15 ¶¶ 79-83.

> **b.    Evidence of Legitimate Nondiscriminatory Reasons for the Actions**

Even if Plaintiff had proffered evidence creating an inference of discrimination, his claims would still falter at the next step.  Defendants have proffered legitimate, nondiscriminatory reasons for many of the adverse employment actions at issue, and Plaintiff has not proffered any evidence based on which a reasonable jury could find that these reasons are pretextual.

Defendants have pointed to reasons for each of the CDs that Plaintiff received; for many of these, Plaintiff admits that he committed the underlying violation.  For example, Plaintiff asserts that the CD that was substantiated against him in November 2015 for failing to properly document his equipment was discriminatory, but Plaintiff admits that he did not properly document his equipment.  Dkt. No. 107 at 31 ¶¶ 148-150.  Plaintiff asserts nonetheless that this CD was discriminatory and offers as support for this assertion only his own testimony that he believes it was "written by Deputy Inspector Ge because of [his] race," and he believes that "[b]ecause [he] feel[s] that they were targeting [him]; they were singling [him] out, and they were targeting [him]."  Dkt. No. 107 at 31 ¶ 150 (citing Ex. 2 at 164-165).  This wholly conclusory claim does not demonstrate that Defendants' asserted reasons for the CDs were not the actual reasons for them and thus cannot rebut the legitimate, nondiscriminatory reason for the CD that Defendants cite.  *See Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 543-44 (E.D.N.Y. 2003) (holding that where defendant "has set forth legitimate non-discriminatory reasons for each disciplinary action, which Plaintiff has failed to refute with any evidence other than his own conclusory statements that he believed the disciplinary actions were unwarranted,"

and plaintiff "[did] not, for example, refute the specific conduct upon which each disciplinary action was based," summary judgment was warranted).  Because Plaintiff has failed to carry his burden to demonstrate an inference of discriminatory intent and to show the legitimate nondiscriminatory reasons proffered by Defendants for any of the CDs he received were pretextual, these actions cannot support a Title VII adverse employment discrimination claim.

Additionally, Defendants have proffered evidence of legitimate, nondiscriminatory reasons for Plaintiff's reassignment:  Plaintiff was first removed from his conditions post temporarily as a penalty for a March 2013 CD, which he admits to having received and further admits to having committed the underlying violation.  Dkt. No. 107 at 10 ¶¶ 56-59.  Although Plaintiff asserts, citing again only to his own testimony, that the "sole motivation for removing Harge from his conditions post was to inhibit his ability to do what he was excelling at and was better at than any other Highway Officer, getting drunk drivers off the road," he does not offer evidence that Defendants at the time had reasons other than that he engaged in the conduct that formed the basis for the CD.  Dkt. No. 107 at 10 ¶ 59.  *See Baptiste*, 2007 WL 747796, at *7 ("Plaintiff's mere subjective belief she was discriminated against because of her race, oft-expressed in her deposition testimony on the subject, cannot sustain a charge of race discrimination." (citing *Holt*, 95 F.3d at 129)).   Moreover, the fact that Morgan, who temporarily removed Plaintiff from the post, was the same person who had originally assigned him to it, and later returned him to the post, further indicates that this removal was motivated by legitimate non-discriminatory reasons.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("Although each case must involve an examination of all the circumstances, some factors strongly suggest that invidious discrimination was unlikely.  For example, when the person who made the decision to fire was the same person who made the decision to hire, it is

difficult to impute to her [or him] an invidious motivation that would be inconsistent with the decision to hire."). Plaintiff asserts that his supervisors' behavior shifted after his receipt of the MADD award, which might cut against this "same actor" argument, but the temporary removal occurred *prior* to Plaintiff's receipt of the MADD award.

Defendants similarly proffer evidence of legitimate, non-discriminatory reasons for Plaintiff's subsequent permanent removal from his conditions post. Plaintiff was returned to patrol and assigned to day tours after receipt of another CD for a similar violation. Dkt. No. 107 at 14-15 ¶¶ 77-79. Plaintiff has not proffered any evidence to suggest that this was not typical protocol, or that other similarly situated officers did would not have received the same treatment and penalties. And Defendant Sanford testified at length that he did not return Plaintiff to the conditions post because of concerns about Plaintiff frequently being off-post. Dkt. No. 95 ¶ 81 (citing Ex. 6 at 63-64). Plaintiff argues that this was pretextual, but absent any evidentiary support, this argument is unavailing.

### 3.    NYCHRL Discrimination Claim

"Courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'" *Ya-Chen Chen v. City University of New York*, 805 F.3d 59, 75 (2d Cir. 2015) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 109, 109 (2d Cir. 2013)). However, even under this broad analysis, "the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions. If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Id.* at 76 (internal quotations omitted); *see also*

*Williams v. Regus Management Group,* LLC, 836 F. Supp. 2d 159, 171 (S.D.N.Y. 2011) (noting

that "for both discrimination and retaliation claims under the NYCHRL, courts continue to apply

the three-step, burden-shifting framework that the Supreme Court articulated in *McDonnell*

*Douglas Corp. v. Green*").  While "claims under the NYCHRL are more liberally construed than

claims under Title VII . . . , the NYCHRL does not alter the kind, quality, or nature of evidence

that is necessary to support or defeat a motion for summary judgment under Rule 56." *Williams*,

836 F. Supp. 2d at 170-71 (internal quotation omitted).

Here, even under the broader NYCHRL analysis, Plaintiff's claims still lack any support

in the evidence from which a jury could return a verdict.  In particular, for the reasons stated

above, Plaintiff has failed to point to evidence creating an inference of discrimination, or to rebut

Defendants' evidence of legitimate nondiscriminatory reasons for its actions.  *See Marseille v.*

*Mount Sinai Health System, Inc.*, 2021 WL 3475620, at *5 (S.D.N.Y. Aug. 5, 2021) (granting

summary judgment on an NYCHRL discrimination claim where the plaintiff alleged that her

colleagues "were not subject to the same discipline and treatment as she was," but "failed to put

forth any evidence sufficient to create a genuine question of fact whether any similarly situated

colleague was treated differently from Plaintiff"); *Moore v. Metropolitan Transp. Auth.*, 999 F.

Supp. 2d 482, 500-01 (S.D.N.Y. 2013) (granting summary judgment on an NYCHRL

discrimination claim where "the evidence . . . does not meet Plaintiff's burden to show that the

[actions] were based in part on discrimination").  Here too, as discussed above, Plaintiff has

failed to point to evidence creating an inference of discrimination and has failed to proffer any

evidence of similarly situated employees—except for their race—being treated differently or any

other evidence of pretext.

### B. Hostile Work Environment

"The standard for showing a hostile work environment under Title VII [and] Section

1983 . . . is essentially the same." *Smith v. Town of Hempstead Dep't of Sanitation Sanitary*

*Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) (citing *Schiano v. Quality Payroll*

*Systems, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006); *Patterson v. County of Oneida, N.Y.*, 375 F.3d

206, 225 (2d Cir. 2004)).

"To establish a hostile work environment . . . a plaintiff must show that 'the workplace is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive work

environment.'" *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17,

21 (1993)).  The test "has objective and subjective elements: the misconduct shown must be

severe or pervasive enough to create an objectively hostile or abusive work environment, and the

victim must also subjectively perceive that environment to be abusive." *Rivera v. Rochester*

*Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation omitted).  "In

determining whether a plaintiff suffered a hostile work environment, [the Court] must consider

the totality of the circumstances, including 'the frequency of the discriminatory conduct; its

severity; whether is it physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*,

510 U.S. at 23).  "As a general rule, incidents must be more than episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294

F.3d 365, 374 (2d Cir. 2002) (internal quotation omitted).

Additionally, "Title VII does not prohibit employers from maintaining nasty, unpleasant

workplaces. . . . Rather, it prohibits employers from discriminating against an employee

(including by subjecting him or her to hostile working conditions) 'because of such individual's

[membership in a protected class].' The prohibited causal factor requirement thus flows directly from the text of Title VII, and from the very essence of its nature as *anti-discrimination* law." *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010) (Lynch, J. sitting by designation). Plaintiff must be the target of the hostile work environment and subjected to the hostility *because of* membership in a protected class. "It follows that 'mistreatment at work . . . through subjection to a hostile workplace . . . is actionable under Title VII only when it occurs because of an employee's [protected characteristic].'" *Id.* (citing *Brown*, 257 F.3d at 252); *accord Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002) ("It is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex.").

Plaintiff has offered borderline evidence that, at least with respect to him, the workplace was characterized by "intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris*, 510 U.S. at 21). Plaintiff in his briefing argues that "Plaintiff and the witnesses describe behavior that was humiliating and emotionally damaging, pecuniarily damaging, physically dangerous, damaging to his career and it interfered with Plaintiff's relationship with his children." Dkt. No. 104 at 19 (citing Dkt. No. 106 ("Harge Decl.")). He asserts that he was subject to increased supervision, increased approval requirements for days off, restrictions from driving an unmarked car, and rules about eating at his desk that others were not subject to. He also asserts that he had less time to prepare summonses before court than others, that he was subject to instructions to give him endless work, that he was posted close to Highway 3, and that that he was called back to the precinct frequently. *Id.* He also asserts, as detailed above, that he received many CDs and write-ups in

the minor violations log.  Finally, Harge describes a specific incident wherein he was "required to drive an [sic] belligerent motorist to the precinct, despite the fact that he had been injured in the course of the arrest," and that "not only was he denied immediate medical care, his return to light duty became an excuse for increased scrutiny and unfair disciplinary actions."  Dkt. No. 107 at 41 ¶¶ 23-24.

The evidence fails to create a triable issue that Plaintiff was subjected to "'*discriminatory* intimidation, ridicule, and insult,'" *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris*, 510 U.S. at 21), or that the unpleasant environment was caused by Plaintiff's race, *Krasner*, 680 F. Supp. 2d at 513.  First, some of the comments made towards Plaintiff lack any indicia of race-based animus, and Plaintiff admits that Defendants Lipke and Santiago "never said anything racially derogatory" to him.  *See* Dkt. No. 107 at 26 ¶ 128, 33 ¶ 164.  Plaintiff does assert that Morgan called him a "cancer" and a "boob," but those insults are not racially-tinged.  Dkt. No. 104 at 5. They could be and are made about anyone whose presence was unwanted, who spreads unwanted behavior or sentiments, or whose intelligence is called into question.  *See Milord-Francois v. New York State Office of Medicaid Inspector General*, 2020 WL 5659438, at *14 (S.D.N.Y. Sept. 23, 2020) (holding that comments about plaintiff's "demeanor and attitude at work and her having a 'scowl face,' may have been crude or inappropriate, but there is no evidence it was discriminatory"); *Smith v. City of New York*, 385 F. Supp. 3d 323, 340 (S.D.N.Y. 2019) (holding where remark "bears non indicia of race-based animus," and is "facially race-neutral," no reasonable jury could interpret this remark as evincing an intent to discriminate").

There is evidence of some racially-tinged comments in the record.  Khazin testified that one of the midnight patrol sergeants—who is not a defendant here, and who Plaintiff did not work with directly—referred to black people as "monkeys" and "savages."  Dkt. Nos. 104 at 9;

104-4, Ex. 4, at 50.  Khazin also testified regarding Donald Schneider, who is the head of

personnel for the Highway District: "He indicated to me that the commanding officer wants to

speak to him in regards to how many Blacks we have in Highway.  He stated to me that this is all

due to the fact that Dana Harge made a complaint.  In the same conversation he indicated to me

these people always make complaints.  That one, pointing to Sce's locker, he always tells

everyone that he is being retaliated . . . ."  Dkt. No. 104-5, Ex. 5, at 28.  Plaintiff also testified

that Sanford told him that he "probably did intimidate [someone] because you're big and you're

a black guy."  Dkt. No. 104 at 8.  With regard to Khazin's testimony, there is no indication that

Khazin ever told Plaintiff about these incidents, or that Plaintiff was aware of these comments

prior to this litigation.  "[R]emarks made outside a plaintiff's presence can be relevant to a

hostile work environment claim," but this is true only when those remarks contribute to the

Plaintiff's own experience at the workplace.  *Leibovitz v. New York City Transit Authority*, 252

F.3d 179, 190 (2d Cir. 2001); *see also Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997) ("The

fact that many of [a supervisor's] statements were not made in [plaintiff's] presence is, in this

case, of no matter; an employee *who knows* that her boss is saying things of this sort behind her

back may reasonably find her working environment hostile." (emphasis added)).  A plaintiff

cannot retroactively experience hostility because of comments he did not learn about until after

he commenced litigation claiming a hostile workplace.  As such, the comments Khazin testified

about cannot contribute to Plaintiff's hostile workplace claim.  Thus, there remains only one

comment Plaintiff can rely on to support his claim: Sanford's statement that Plaintiff "probably

did intimidate [someone] because you're big and you're a black guy."  Dkt. No. 104 at 8.

"[E]ven a single episode of harassment, if severe enough, can establish a hostile work

environment," but "[f]or racist comments, slurs, and jokes to constitute a hostile work

environment, there [generally] must be more than a few isolated incidents of racial enmity."
*Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) (first quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999), *abrogated on other grounds by Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), then quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)) (alteration in original).  In *Fleming*, the Second Circuit held that where plaintiff "put forth evidence of only one incident that is plainly motivated by race," even though "this comment may be seen as severe, it is isolated and, standing alone, is not the type of 'intolerable alteration' of her working conditions that substantially interferes with her ability to do her job."  *Fleming*, 371 F. App'x at 118 (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008)).  The Second Circuit found that this was true even though plaintiff alleged that the comment was "followed by numerous incidents of unfair treatment."  *Id.*  Here too, Sanford's isolated comment that Plaintiff "probably did intimidate [someone] because [he is] big and [he is] a black guy," Dkt. No. 104 at 8, cannot on its own reasonably support a finding that Plaintiff's "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  *Fleming*, 371 F. App'x at 118 (quoting *Harris*, 510 U.S. at 21).

Second, although Plaintiff offers his own opinion and those of Khazin, and Madourous that Plaintiff was targeted because of his race, those opinions are not based on evidence that could lead a reasonable jury to conclude either that the environment was discriminatorily intimidating or that Plaintiff subjectively believed it to be so.  Tellingly, Plaintiff has not proffered evidence of discriminatory statements addressed to him or said about him by his supervisors, nor has he proffered evidence that similarly situated employees who were not members of his protected class were treated differently.  The evidence fails to establish that the

asserted reasons for the CDs—Plaintiff's conduct—was not the actual reasons or that the actual reasons were discriminatory.  Although Plaintiff alleges that he was "denied the normal protection and treatment afforded to officers who had been subjected to violence at the hands of violet [sic] arrestees," Defendants persuasively note that there is no evidence in the record about the "normal protection and treatment afforded to" other officers and that the protection Plaintiff received was other than the protection that any other officer would receive.  Dkt. No. 115 at 43-44 ¶¶ 23-24.  In short, except for the insufficient and conclusory opinions by Plaintiff and his two co-workers, Plaintiff has failed to offer evidence from which a jury could conclude that the treatment he received and the environment he experienced was because of his race and not because of his disciplinary history.  As such, on the record before the Court, Plaintiff has not proffered evidence that would allow a reasonable fact-finder to determine that he was subjected to a hostile environment because of his race.

### C.    Retaliation

Plaintiff's retaliation claim is predicated on many of the same allegations and incidents as his adverse employment discrimination and hostile work environment claims, and it suffers from the same evidentiary defects.

Retaliation claims under Title VII are also analyzed under the *McDonnell Douglas* burden shifting framework.  *Smith v. N.Y.C.*, 385 F. Supp. 3d 323, 345 (S.D.N.Y. 2019).  In order to establish a prima facie case of Title VII retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  As in the discrimination context, "[t]he plaintiff's burden of proof as to this first step 'has been characterized as

"minimal" and "*de minimis*."'" *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013)

(quoting *Jute*, 420 F.3d at 173). "In determining whether this initial burden is satisfied in a Title

VII retaliation claim, the court's role in evaluating a summary judgment request is to determine

only whether proffered admissible evidence would be sufficient to permit a rational finder of fact

to infer a retaliatory motive." *Jute*, 420 F.3d at 173.

It is undisputed that Plaintiff engaged in protected activity, including by filing several

EEOC complaints and filing this lawsuit. It is also undisputed that Defendants were aware of

this activity. Plaintiff's claim, once again, falters on the causation element.

Title VII retaliation claims require that a plaintiff "establish that his or her protected

activity was a but-for cause of the alleged action by the employer," and not merely a

"substantial" or "motivating" factor, which is sufficient for a discrimination claim. *Univ. of Tex.*

*Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 348 (2013). At the prima facie stage, a plaintiff may

show causation either indirectly, "by showing that the protected activity was closely followed in

time by the adverse action," *Kwan*, 737 F.3d at 845 (quoting *Gorman-Baker v. Cornell Coop.*

*Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)), or directly, "through

evidence of retaliatory animus directed against the plaintiff by the defendant," *Hicks*, 593 F.3d at

170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "Once a prima

facie case of retaliation is established, the burden of production shifts to the employer to

demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Raniola v.*

*Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). If the employer carries that burden, then the burden

shifts back to the plaintiff, who must establish "that the employer's action was, in fact, motivated

by discriminatory retaliation." *Id*; *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d

Cir. 2000) ("Upon the defendant's articulation of such a non-discriminatory reason for the

employment action, the presumption of discrimination arising with the establishment of the prima facie case drops from the picture.  For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.").  Additionally, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).  Similarly, "[i]f an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory."  *Cayemittes v. City of N.Y. Dept. of Hous. Preservation and Development*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) (quoting *Wright v. N.Y.C. Off-Track Betting Corp.*, 2008 WL 762196, at *5 (S.D.N.Y. Mar. 24, 2008)).

As with his adverse employment discrimination and hostile work environment claims, Plaintiff does not provide any direct evidence of retaliatory animus by his supervisors.  However, he can still indirectly establish a prima facie inference of retaliation by showing that the protected activity was closely followed in time by the adverse action," *Kwan*, 737 F.3d at 845 (quoting *Gorman-Baker v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).  Nonetheless, any such inference here fails, both because much of the activity alleged to be retaliatory also took place prior to Plaintiff engaging in any protected activity, which defeats an inference of retaliation based on timing, and because Defendants have pointed to legitimate, nondiscriminatory reasons for the alleged retaliatory actions, which Plaintiff fails to rebut with any evidence demonstrating pretext.

First, much of the activity that Plaintiff alleges is retaliatory is identical to Plaintiff's treatment prior to the filing of his first EEO complaint, on August 28, 2015.  *See* Dkt. No. 107 at

29 ¶ 143.  The alleged retaliatory activity includes increased monitoring, rules and scrutiny, issuance of CDs and being written up in the minor violations log, being denied days off, issuance of charges and specifications, and lower annual evaluations.  However, it is undisputed that Plaintiff was receiving CDs and being written up in the minor violations log—in a manner that he felt was unfair and for similar violations—both before and after he filed his first complaint.  Similarly, charges and specifications were issued against Plaintiff for CDs which he refused to accept penalties for; some of these CDs and refusals occurred before Plaintiff filed his first complaint.  Plaintiff complained about disproportionate monitoring and scrutiny beginning well before the filing of his first complaint.  And on at least one occasion, Plaintiff alleges that he was denied time off before the filing of his first complaint.  *See* Dkt. No. 50 ¶ 116.

Second, even if Plaintiff could establish an initial inference of retaliation for some of these actions—such as the lower evaluations—as with his adverse employment discrimination and hostile work environment claims, Plaintiff has pointed to no evidence indicating that these were retaliatory rather than, as Defendants argue, legitimate and nondiscriminatory responses to his performance and disciplinary history.  Defendants argue that they "have offered legitimate non-retaliatory reasons for the disciplinary actions," because "defendants had repeated issues with plaintiff not following departmental rules and regulations notwithstanding numerous efforts to correct his behavior," and further point out that "plaintiff admitted to committing a number of the infractions for which he was disciplined."  Dkt. No. 97 at 26.  Plaintiff's response does not address any of the specifics of his retaliation claim, let alone point to evidence indicating that these reasons were pretextual and these actions were in fact retaliatory.  Indeed, Plaintiff's only assertion about the retaliation claim is that "it is impossible to distinguish acts after those dates from mere acts of discrimination or whether they were retaliatory in nature."  Dkt. No. 104 at 24.

In other words, Plaintiff concedes that he does not have any evidence indicating that these actions were retaliatory, and the record is devoid of any such evidence. This defect is fatal to Plaintiff's retaliation claim.

Plaintiff also brings retaliation claims under NYCHRL. As with discrimination claims, retaliation claims under the NYCHRL are "broader than Title VII's", and "protect[] plaintiffs who 'oppos[e] any practice forbidden under' the law from conduct 'reasonably likely to deter a person engaging in such action." *Ya-Chen Chen*, 805 F.3d at 76 (quoting *Mihalik*, 715 F.3d at 112). NYCHRL retaliation claims are also "evaluated under the familiar *McDonnell Douglas* three-step burden-shifting framework." *Marseille*, 2021 WL 3475621, at *11 (citing *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 394 (S.D.N.Y. 2019)). The elements of a prima facie case of retaliation under Title VII and the CHRL are "identical," except that the CHRL employs a broader standard of an "adverse employment action" than its federal and state counterparts. *Smith*, 385 F. Supp at 345-46 (citing *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016)). Thus, even under the NYCHRL's broader framework, a retaliation claim still hinges on a causal element between the protected activity and the alleged retaliatory conduct. As such, Plaintiff's NYCHRL retaliation claim suffers from the same defect as Plaintiff's Title VII retaliation claim—plaintiff has proffered no evidence that would allow a reasonable jury to find that Defendants' actions were retaliatory.

### D.    Aiding and Abetting

Defendants also move for summary judgment on Plaintiff's claim of aiding and abetting under the NYCHRL. "[A]iding and abetting is only a viable theory where an underlying violation has taken place." *Falchenberg v. N.Y.S. Dept. of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009). Thus, because Plaintiff's discrimination and retaliation claims "fail[] on [their] merits, [his] aiding and abetting claims fail as well." *Id.*; *see also Boonmalert v. City of New York*, 721

F. App'x 29, 34 (2d Cir. 2018) ("Since there is no underlying . . . NYCHRL violation, there was

no aiding or abetting of acts forbidden by the . . . NYCHRL." (citing *Feingold v. New York*, 366

F.3d 138, 158 (2d Cir. 2004))).

## II.   Collateral Estoppel

Defendants also move for summary judgment, arguing that many of Plaintiff's claims

that actions against him were discriminatory and retaliatory are collaterally estopped by the

rejection of those same claims in Plaintiff's Article 78 proceeding.

"The 'fundamental notion' of the doctrine of collateral estoppel, or issue preclusion, 'is

that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a

prior action may not be relitigated in a subsequent suit between the parties or their privies.'" *Ali*

*v. Mukasey*, 529 5.3d 478, 489 (2d Cir. 2008) (quoting *U.S. v. Alcan Aluminum Corp.*, 990 F.2d

711, 718-19 (2d Cir. 1993)) (internal emphasis omitted).  "This doctrine applies equally to

judgments by New York state courts, to which a federal court must give 'the same preclusive

effect as would be given to the judgment under the law of the State in which the judgment was

rendered.'" *Constantine v. Teachers College*, 448 F. App'x 92, 93 (2d Cir. 2011) (quoting

*Johnson v. Watkins*, 101 F.3d 792, 794 (2d Cir. 1996)).

Collateral estoppel "bars relitigation of an issue when (1) the identical issue necessarily

was decided in the prior action and is decisive of the present action, and (2) the party to be

precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the

prior action." *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006) (citing *Kaufman v. Eli Lilly &*

*Co.*, 482 N.E.2d 63, 67 (N.Y. 1985)).  It is well-established that Article 78 proceedings can have

preclusive effect.  *See Constantine*, 448 F. App'x at 93-94 (holding that Article 78 proceeding

precluded plaintiff's claims of employment discrimination and retaliation); *Sorano v. Taggart*,

642 F. Supp. 2d 45, 53 (S.D.N.Y. 2009) ("[D]efendants correctly assert that the doctrine of

collateral estoppel precludes [plaintiff] from relitigating the issues raised in the Article 78

proceeding." (citing *Parker v. Blauvelt Volunteer Fire Co., Inc.*, 712 N.E.2d 647, 651 (N.Y.

1999)).

Here, Plaintiff filed an Article 78 petition, appealing, inter alia, the ADCT's

determination that there was no racial bias in the underlying disciplinary actions at issue in that

proceeding, which included many of the CDs Plaintiff here alleges are discriminatory and

retaliatory.  Plaintiff does not appear to contest the fact that he had a full and fair opportunity to

litigate the issue of whether the charges considered in that proceeding were racially motivated:

> As to those specific charges, listed by Defendants and only to those specific charges
> litigated and found against the Plaintiff, he agrees, those cannot be litigated further.
> However, the law is clear, and Defendants do not seem to contest the fact that this
> in no way prevents Plaintiff from litigating other events and said acts being racially
> motivated.

Dkt. No. 104 at 12-13.  Therefore, the Article 78 proceeding precludes Plaintiff from arguing

here that the same underlying charges—namely, the CDs from June 2014, May 2015, July 2015,

November 2015, May 2016, and June 2016, as well as the charges and specifications from

August 2016, November 2017, and April 2017—were motivated by discriminatory or retaliatory

animus.[5]

---

[5] Plaintiff also argues:

> Additionally, the actions in state court were not plenary actions. In Bowne
> Management the Court found that "[w]here the parties' dispute is primarily focused
> on whether the damages allegedly sustained by the petitioner arise from a breach
> of the contract, those claims must be resolved in a plenary action, not an Article 78
> proceeding." Bowne Management Systems, Inc. v. New York City Department of
> Transportation, 2010 NY Slip Op 30563, 22[U] (Sup. Ct. NY Co. March 16, 2010).

Dkt. No. 104 at 14.  To the extent that Plaintiff is arguing that he is suing here for damages, and
damages are not available in an Article 78 action, rather than a plenary action, that argument is
unavailing.  *See Giakoumelos v. Coughlin*, 88 F.3d 56, 61 (2d Cir. 1996) ("Although [plaintiff]
therefore may not be estopped from bringing his claim for damages, the correct application of
collateral estoppel requires that the issues raised in the subsequent action be decided by reference
to the previous state court judgment.  In other words, [plaintiff's] claim for damages must be

**CONCLUSION**

For the foregoing reasons, the motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 94 and close the case.

SO ORDERED.

Dated: August 26, 2021
      New York, New York

_____

LEWIS J. LIMAN
United States District Judge

---

rejected because the constitutionality of the disciplinary proceedings was already determined against him in the Article 78 proceeding.").